## UNITED STATES v. STANDARD OIL CO. (INDIANA) et al.

District Court, N. D. Illinois, E. D.  June 11, 1929.

No. 4131.

Before EVANS, PAGE, and ANDERSON, Circuit Judges.

John G. Sargent, Atty. Gen., William J. Donovan, Assistant to the Atty. Gen., George E. Q. Johnson, U. S. Atty., of Chicago, Ill., Rush H. Williamson and Horace R. Lamb, both of Washington, D. C., and Benjamin T. Rauber. and Ralstone R. Irvine, Sp. Assts. Atty. Gen., for the United States.

Chauncey W. Martyn, Harry A. Daugherty, Louis L. Stephens, and Russell Wiles, all of Chicago, Ill., for Standard Oil Co. (Indiana).

Chester O. Swain, of New York City, and Stuart Templeton, of Chicago, Ill., for Standard Oil Co. (New Jersey) and another.

C. B. Ames, of Oklahoma City, Okl., and Drury W. Cooper and Harry T. Klein, both of New York City, and Silas H. Strawn, of Chicago, Ill., for Texas Co. and another.

Cutting, Moore & Sidley, of Chicago, Ill., Cutcheon, Taylor, Bowie & Marsh, and Ramsay Hoguet, all of New York City, and

Thomas E. Scofield, of Kansas City, for Gasoline Products Co., and others.

Frank L. Crawford, of New York City, and John A. Massen, of Chicago, Ill., for Galena Signal Oil Co. (Texas).

Humphrey, Crawford & Middleton, and Marvin H. Taylor, all of Louisville, Ky., for Standard Oil Co. (Kentucky).

Vermilion, Evans, Carey & Lilleston, of Wichita, Kan., and Harry A. Daugherty, of Chicago, Ill., for Standard Oil Co. (Kansas).

G. H. Dorr, of New York City, for Standard Oil Co. (New York).

W. T. Holliday, of Cleveland, Ohio, and Donald Defrees and Stephen E. Hurley, both of Chicago, Ill., for Standard Oil Co. (Ohio).

James H. Ball and Burton W. Musser, both of Salt Lake City, Utah, and Albert L. Green, of Chicago, Ill., for Utah Refining Co.

Hopkins, Starr & Hopkins, of Chicago, Ill., and H. O. Bentley, of Lima, Ohio, for Solar Refining Co.

Weeks, Morrow & Francis, of Wichita Falls, Kan., and Jeffery, Townley, Wild, Campbell & Clark, of Chicago, Ill., for American Refining Co.

Bates, Hicks & Folonie, of Chicago, Ill., for Humble Oil & Refining Co.

Koerner, Fahey & Young, of St. Louis, Mo., and Adams & Hawley, of Chicago, Ill., for Roxana Petroleum Co.

Mayer, Meyer, Austrian & Platt, of Chicago, Ill., and Pillsbury, Madison & Sutro, of San Francisco, Cal., for Standard Oil Co. (California).

James M. Johnson, Donald W. Johnson, and Charles French, all of Kansas City, Mo., for Interstate Refineries, Inc.

Edward D. Ellison, and Patrick Carr, both of Kansas City, Mo., for Lion Oil Refining Co.

Ashcraft & Ashcraft, of Chicago, Ill., for Owl Oil Co.

Francis I. Fallon, Rupert B. Thomas, T. Houston Solley, and Frank M. Swacker, all of New York City, and W. C. Franklin, of Tulsa, Okl., for Tide Water Oil Co. and another.

Gaston, Snow, Saltonstall & Hunt, of Boston, Mass., for Beacon Oil Co.

W. H. Francis and A. S. Hardwicke, both of Dallas, Tex., for Magnolia Petroleum Co.

John J. Jones, of Kansas City, Mo., for White Eagle Oil & Refining Co.

Fisher, Boyden, Kales & Bell, of Chicago, Ill., and Joseph H. Adams, of New York City, for Pure Oil Co.

S. S. Searcy, of San Antonio, Tex., for Jones & Co., Inc.

Victor Keller, of Chicago, Ill., for Grayburg Oil Co.

Wilkinson, Huxley, Byron & Knight, of Chicago, Ill., for Vacuum Oil Co.

EVANS, Circuit Judge. Petitioner brought this suit to enjoin alleged violations of sections 1 and 2 of the Sherman Act (15 USCA §§ 1, 2). Defendants are grouped into two classes, one called primary defendants (the Standard Oil Company of Indiana, the Texas Company, the Standard Oil Company of New Jersey, and Gasoline Products Company) and the other, described as secondary defendants, included forty-six corporations and one individual.

Two defendants, Joseph H. Adams and M. W. Kellogg Company, were later made parties defendant. As to Adams, petitioner sought the cancellation of certain patents to him issued because of fraud practiced in their procurement. As to Kellogg Company, it was charged that it was in a conspiracy with the primary defendants to injure competitors who were engaged in licensing producers under processes covered by patents belonging to one Fleming.

All the defendants are engaged in manufacturing, selling, or handling gasoline within the confines of the United States. Petitioner charges an unlawful combination and conspiracy to monopolize interstate trade and commerce in cracked gasoline. This alleged monopoly or illegal restraint of trade exists, so it is alleged, because of certain agreements which deal with the right to use certain patented processes and apparatus.

The primary defendants executed certain so-called cross-license agreements. The secondary defendants thereafter took sublicenses from one or the other of the primary defendants.

It appearing that the time consumed in the taking of evidence would cover months, and the business of the Court of Appeals not permitting of the withdrawal of three judges for such a period, a reference was had, and Attorney Charles Martindale of Indianapolis was appointed a special master in chancery to hear the evidence and to make findings of fact and conclusions of law thereon.

The testimony taken was voluminous, and its presentation required many months. After a full hearing, the master found for defendants. He made findings of fact and conclusions of law (covering 384 printed pages). Petitioner duly excepted, and the questions here presented arise out of such exceptions to the master's report. Space prevents our incorporating in full the exhaustive report of

the master. A brief résumé is herewith attempted:

Beginning about 1900, and coincident with the successful development of the internal combustion hydrocarbon engine, there arose in this country a tremendous demand for petroleum as a motive power. Following this demand, came improved methods for the separation of gasoline from crude oil. Generally speaking, the effective method of disintegration was through the application of heat. But the demand continued to multiply. This increased demand presented the perplexing problem of increasing the volume of gasoline from a given amount of crude oil. The gasoline consumption which in 1904 was 290,-000,000 gallons rose in 1925 to 11,173,806,000 gallons. During the same time, the production of crude oil increased only 600 per cent. Increased production of gasoline followed the introduction of distillation processes whereby a larger percentage of gasoline was extracted from crude oil. In 1904 only 2.48 gallons of gasoline were obtained from a barrel of crude oil. In 1925 this amount was increased to 14.63 gallons per barrel.

It is out of the agreements respecting the use of the processes and the apparatus to apply the processes for producing gasoline that the alleged monopoly arises. These processes generally relate to what is known as "pressure cracking." In other words, an increase of heat or prolonged application of heat to the crude oil, or an application of it under pressure, increased under certain circumstances the amount of gasoline obtainable from a given quantity of oil. Generally speaking, this separation of the molecules that results from the application of heat to the petroleum distillate is what those skilled in this art call "cracking." Respecting it, we quote from the master's report.

" 'Cracking' is a very broad term which covers almost any splitting apart or joining together of hydrocarbon molecules. In this Record we have to deal only with pyrogenetic 'cracking.' The reactions are extremely complex—so complex that the most learned chemists and physicists are careful to limit and qualify what they know about what takes place in the reactions. Eminent chemists and physicists who know the most about this art are the most modest about what they know. There are still volumes to learn as to why these molecules composed of hydrogen and carbon split in quite unexpected ways. One cannot make such generalization in regard to reactions because things which are true for one set of conditions or for one type of oil are not true for some other set of conditions or some other type of oil. Instead of being a simple, well-understood art, this is a highly complex art with a very large field, still, for exploration and for the revelation of new methods and new compounds.

"The phenomena of behavior of molecules and atoms in petroleum are still mysterious. Molecular behavior when the existing arrangement is broken up can be predicated under certain now known conditions. Given a certain substance derived from petroleum, apply selected factors of degrees of heat, degrees of pressure, and time of reaction, and one may expect a certain result. New molecular arrangements have resulted in new compounds. Given a different substance of a different molecular arrangement and apply the same factors and something different happens. What substance to choose; what factors of heat, pressure and time to apply; the means to apply them and means for separation of resulting fractionation to get more and better motor fuel, was the extensive field of research and experiment into which the chemist adventurer was to fare forth in the first decade of this century armed with what discoveries in the chemistry and physics relating to the art had been made prior thereto.

"It is conceded that in the cracking of oil there are generally produced by 'cracking' both lighter constituents and heavier constituents, and the attention of the chemist in this art is usually focused merely on the lighter constituents; and also that if cracking is carried to an extent sufficient to make any considerable amount of gasoline, there will be resultant coke and gas.

"The great advancement in the last quarter of a century in the development of steels has made it possible to control pressure so far beyond those which were formerly considered dangerous that the new compounds of high distillation have revolutionized some industries. In this industry, where formerly 75 pounds to the square inch was considered approaching the dangerous pressure, in the Cross process of the defendant Gasoline Products Company, a pressure of 700 to 850 pounds to the square inch is availed of and may even go beyond that point.

"We are dealing here with 'cracking processes' to produce motor fuel employing heat and pressure. A 'cracking process' in this sense is one in which the splitting apart and joining together of the hydrocarbon molecules proceed to an extent sufficient to form products suitable for motor fuel in commercial quantities by temperature, pressure, and sufficient time of reaction under favorable

conditions to allow the disrupted and disarranged molecules to form new molecular combinations.

"The art under examination has been classified into four types of pyrogenetic cracking processes, which are:

"First. Bulk distillation at atmospheric pressure, which is characterized by the fact that a large body of oil is held at a cracking temperature for a very long period of time (a matter of hours or days). This would include the class of operation in which cracking takes place in the latter part of the ordinary coking method of running crude oil. This is the method by far the most widely used prior to 1912 and is still very widely used. It is very simple and easy to carry out and produces considerable quantities of kerosene (which was the product most desired from the crude oil prior to the demand for motor fuel). This method of cracking was only applicable to materials which boiled higher than gas oil (well above 700 degrees), because everything in the ordinary gas oil range and lower distilled out before appreciable cracking began to take place. It was only the heavy products which stayed in the still that were cracked to any considerable extent. This method requires hours or days at temperatures generally betwen 700 and 820 degrees F., and such processes usually run to a coke bottom which is not feasible in bulk pressure distillation. The method produces comparatively little gasoline together with considerable gas and a large amount of coke.

"Second. Bulk pressure distillation—a very slow distillation. In this method a large body of oil is held at a cracking temperature for a long period of time—a matter of hours and days—but under substantial pressure, and there is distilled out of the system the products somewhere nearly as fast as they are formed, letting the unchanged products stay back for a longer time under cracking conditions. The degree of pressure, of course, correspondingly raises the degree of temperature at which given products can be held liquid, and therefore tends to increase the cracking rate and makes it possible to crack lighter materials than in a still without pressure.

"Third. Tube cracking—which includes a great many of the prior art processes where the oil is passed through a long narrow retort or tube which is heated generally to a bright red heat and the stream of oil is passed through and undergoes progressive evaporation and decomposition. In some cases, the oil has been vaporized before it enters the cracking system.

"In this method, while passing through the long tube, the oil gradually vaporizes, but both the liquids and the vapors and both the uncracked and the cracked materials go along together and are subject to cracking for approximately the same length of time.

"Tube cracking processes, on account of requiring a shorter time, necessitate the use of a higher temperature in order to produce a reasonable amount of cracking, and they characteristically have operated with temperatures considerably above those used in bulk pressure distillation, and have a time of contact that is measured in minutes rather than in hours and days. All such tube cracking processes have some pressure at the inlet of the coil and in some cases they carry pressure clear through the coil.

"Fourth. Flash or film cracking—in which all the cracking is produced by almost instantaneous contact of oil or oil vapors with a very hot surface. If liquid oil is fed to the apparatus, it is generally dripped or sprayed on the hot surfaces, where it is vaporized and cracked almost simultaneously.

"In this method there is nothing more than a spray or film of liquid oil in the cracking zone and the cracking contact is a matter of seconds or fractions of a second, while the temperatures required are those of red heat of metal or higher. The pressure is usually substantially atmospheric because of the difficulty of building containers which will hold pressure at such temperatures. The hot surfaces employed may be a hot metal retort or frequently of brick or the like.

"While there are references in the exhibited prior art to flash cracking apparatus and processes, none of the patents here in question involve such methods or apparatus, and such references are not applicable to the patents of the defendants.

"The patents in suit employ either bulk-pressure distillation or tube cracking, and to be applicable, the reference must come within these two classifications.

"Bulk distillation at atmospheric pressure has been referred to because it is the method by which is produced what has been referred to in the Record as 'straight run' gasoline."

Each of the primary defendants developed its own processes and constructed apparatus with which to apply its processes, for which it, or its assignors, obtained patents. The Gasoline Products Company secured or acquired 9 patents, the Texas Company, 29 patents, the Standard Oil Company of Indiana, 23 patents, the Standard Oil Company of New Jersey, 15 patents, and the Standard

621

Oil Company of New York, 1 patent. There are 77 patents involved.

Each primary defendant has given a name to its process. The Standard Oil Company of Indiana adopted what is called the Burton processes—the Burton shell still and the Burton tube stills with or without bubble power. The Texas Company adopted what is called the Holmes-Manley process. The Gasoline Products Company followed the teaching of Cross patents. The Standard Oil of New Jersey followed what is known as the Tube-and-Tank process.

The government contends that these patents were all improvement patents covering minor or trivial advances over the prior art, and that each should be given a very narrow construction. It asserts that defendants used them to tie together and reinforce the fences which surrounded their field of monopoly and thereby effectually accomplish what could not, and would not have been accomplished by the patentees singly or individually.

To discuss each and every patent involved in the cross-license agreements would be hardly justifiable. If attempted, this opinion would fill a large volume. The master has gone over those selected by the defendants for attack, and has given a careful statement of the processes and apparatus there disclosed. The summary of his study is herewith reproduced.

"The processes of the primary Defendants, respectively, are the embodiment of the group of patents held by them, respectively, with the exception of a very small number.

"It is very certain that no one could practice the commercial process of either of the primary defendants without running foul of the patents on indispensable features embodied in it.

"It is quite true that there is a recognizable distinction between the usefulness of the plant structures of the defendants respectively, considered as mechanical units, and the utility of separate patented features embodied therein, and likewise a distinction between the usefulness of the commercial process included in each of the respective operations of the primary defendants and the utility of the several and respective inventions described in their process patents. While it is abundantly shown that the respective structures of the primary defendants as mechanical units and the processes which are effectuated by these structures are of very great utility in the art, it does not necessarily follow that such utility is due in equal degree to each of the inventions embodied therein. Nevertheless where it is shown, as it is in this case, that the mechanical units could not exist without the

embodiment therein of the patented mechanical features and that the processes effectuated and carried out by these structures could not be carried on without involving claims of the process patents of the several defendants, there is necessarily imported to each of the inventions so embodied in the structure or involved in the process, a utility of more or less relative importance.

"Therefore, the utility of these commercial processes includes and demonstrates the utility of the patents of the primary Defendants, respectively, pertaining thereto. * * *

"The Burton process of the Standard Oil Company of Indiana went into operation in the latter part of 1912 and was the first process for producing cracked gasoline in large quantities.

"In producing this successful commercial process, the Company had expended, in research and experimental work, and in the erection of the first battery of pressure stills, a sum largely in excess of a million dollars. It doubled the amount of gasoline which could be produced from a given amount of crude petroleum.

"The product first produced was of bad color and offensive odor, and was sold as 'motor spirit.' Later this product was refined and sold as ordinary gasoline.

"From 1912 to 1920 the Standard Oil Company of Indiana, and its licensees, were the only sources in the United States, commercially making cracked gasoline, and during that period the demand for gasoline increased a thousand per cent., while the supply of crude petroleum increased only 200 per cent.

"In 1914 the production of cracked gasoline was 2,028,000 barrels.

"In 1921, the production of cracked gasoline was 21,253,000 barrels.

"As the Burton process was the only commercial process producing cracked gasoline from 1914 to 1921, this enormous increase must be largely attributable to the Burton process.

"It is shown by 'Exhibit No. 2' that Standard Oil Company of Indiana has received from its licensees, including royalties received from The Texas Company and Standard Oil Company of New Jersey, the following amounts:

| | |
|---|---|
| 1914 | $ 73,563 83 |
| 1915 | 332 048 87 |
| 1916 | 1,786,982 62 |
| 1917 | 2,418,627 17 |
| 1918 | 3,154,202 54 |
| 1919 | 3,850,081 66 |
| 1920 | 3,441,925 76 |
| 1921 | 1,990,631 10 |
| 1922 | 4,353,778 07 |
| 1923 | 3,051,857 85 |
| 1924 | 2,414,708 41 |

"The Texas Company began the first installation of the Holmes-Manley batteries in July of 1918 and they were put into commercial operation at Port Arthur in February, 1920. * * * From that time to the beginning of the year 1926 The Texas Company had spent over $14,000,000.00 for installing plants operating the Holmes-Manley process, exclusive of steam plants, power plants, water supply and general tankage used in connection with the cracking operation.

"It now has plants at West Tulsa, Lockport, Illinois, and Caspar, Wyoming. The daily rated gasoline production of all these plants is 1,092,000 gallons.

"From 1920 to 1924, it produced 620,022,990 gallons of cracked gasoline.

"It has received for the use of its patents, from its licensees, the following royalties:

| | |
|---|---|
| 1921 | $426,236 39 |
| 1922 | 943,641 14 |
| 1923 | 601,379 36 |
| 1924 | 986,891 78 |

"This Holmes-Manley continuous cracking process is almost universally agreed to be the highest embodiment of the art of bulk pressure distillation. Whereas, the Burton and Clark, and Clark processes enabled the operator to handle 20,000 gallons of cracking-stock in a cycle of two days (or about 10,000 gallons a day), with the result of obtaining thirty to thirty-five per cent. of gasoline, the Holmes-Manley process puts through approximately 70,000 gallons per day, or seven times as much as the Burton-Clark process, and makes around forty per cent. of gasoline and runs for a period of fifteen to thirty days and frequently longer before having to be shut down because of coking.

"The Holmes-Manley commercial cracking-still embodies in its structure and operation, the inventions of a number of the patents of the defendants. A number of its features are disclosed in the various patents to Adams; others are in the patents issued to Manley, to Holmes, to Behimer, and to Holmes and Manley jointly. It embodies also some of the claims of Clark, Humphreys, Burton (1,160,689), Lewis & Cooke, Burton & Clark (owned by the Standard of Indiana), and some of the claims of Ellis (owned by the New Jersey Company).

"The Standard Oil Company of New Jersey began operating pressure stills under license to use the inventions of the Burton patents of Standard of Indiana in 1915. It began operating its tube and tank stills in 1921.

"From five licensees of its tube and tank process the New Jersey Company received the following amounts:

| | |
|---|---|
| In 1922 | $ 1,462 60 |
| In 1923 | 161,641 80 |
| In 1924 | 356,757 09 |

"Using its tube and tank process, in 1924, it produced 2,615,932 gallons of cracked gasoline.

"The tube and tank process of the Standard Oil Company (New Jersey) was worked out by Mr. Frank A. Howard, in charge of the research work of that company, and Dr. Loomis. It was started by a desire to devise a process of handling the viscous type of Mexican crude oil called 'Panuco Crude.' It was while working on these developments that Howard became impressed with the advisability and necessity of the Company acquiring the Hall patents and the Ellis patents.

"Many of the cracking units involving this tube and tank process, are operated in foreign countries by subsidiaries of the Standard Oil Company, (New Jersey).

"The utility of the tube and tank commercial process of the New Jersey Company is shown, and as said above, imports the utility of the patented inventions embodied in its construction. The importance of the industrial operation of the commercial process lends great importance to the patents covering the industrial embodiment.

"The Gasoline Products Company is not engaged in refining. Its business is limited to the development of a cracking method (the Cross process), owning the Cross patents therefor, issuing licenses thereunder to refiners for operation under that process.

"From all its licensees, from 1921 to 1924, it had received $528,271.28.

"The Doctors, Roy Cross and Walter Cross, in developing the Cross process of the Gasoline Products Company, took a distinct step forward in the gasoline refining art and they have gone further than any other of the inventors in the utilization of very high temperatures and very high pressures, which is in line with the general trend of the art of destructive distillation. Their patents are a contribution of great importance to the patent art relating to the refining industry.

"From all the evidence the Master finds that the inventions of the patents owned by each of the primary Defendants, respectively, are of great utility; that the respective groups of patents owned by the several primary Defendants relate to the same art and general subject matter and the domain covered by each group is so adjacent to the do-

main covered by each of the other groups as that wasteful litigation was likely to be provoked between them and their development of competing refining processes hindered and perhaps frustrated to the detriment of the public interest; that whether and in which instances a patent or patents of one primary Defendant was infringed by either or any of the other primary Defendants in the absence of a license it is not now necessary to decide.

"The Special Master finds that with the exception of not more than five or six, the patents owned by the 'Primary Defendants' are not for 'minor improvements,' in processes and operations for the manufacture of cracked gasoline, but are for substantial, valuable and highly useful improvements, which have made possible the manufacture of cracked gasoline in commercial quantities, have increased the yield of gasoline per barrel of crude many times over and have enabled the supply of gasoline to meet the ever increasing demand.

"That the processes employed by Defendants for cracking gasoline by the application of super-atmospheric pressure and high temperatures, described in the letters patent of the Primary Defendants, are not, in all substantial respects, the same processes as those known and employed long prior to the application for, or issuance of any of their said patents, but were for new and useful and patentable inventions, the utility of which has been shown by the Petitioner itself.

"The Special Master finds that the procuring and treating of said patents as valid by the Defendants, is not a device to lend color of legality to any combination, conspiracy or monopoly, but that said patents were procured in the regular and lawful manner, and were acquired by the Defendants in good faith, for the laudable purpose of producing a larger proportion of gasoline from a given amount of crude petroleum, and for supplying the critical demand in the United States for more gasoline than could be produced by the straight distillation method."

The government singled out two of the patents (property of Texas Company) for special attack. It charged that their issuance had been secured through fraud.

The master found against the petitioner on this issue.

*Fleming Process.* The master also found against the petitioner on the issues raised by the supplemental petition wherein defendant M. W. Kellogg Company and the primary defendants were charged with a conspiracy to increase their monopoly of the cracking processes by injuring a competitor (Flem-ing) who was engaged in selling licenses under his cracking process patents.

The questions presented by petitioner's exceptions to the report are: (1) Does the evidence support (a) the master's findings as to the Adams patents and (b) the master's findings respecting the conduct of M. W. Kellogg Company and the four primary defendants? (2) May petitioner in this suit question the validity or the scope of the patents which it issued? (3) If the preceding question be answered in the affirmative, are the patents valid? (4) Do the agreements of which petitioner complains violate section 1 or 2 of the Anti-Trust Act?

(1) *The Adams Patent.* Petitioner attacks two patents upon the ground that they were obtained by fraud. To support its contention, petitioner produced a witness, B., who testified in effect that the affidavits which certain witnesses signed and filed in the Patent Office were prepared by Adams or his solicitors, and were never read nor sworn to by the affiants, and that the statements appearing in the affidavits respecting certain uses and experiments were untrue. It is inferable that the Patent Office relied upon these affidavits and was induced to act by reason of their presentation.

The master, however, heard other witnesses who were examined and cross-examined. At least two witnesses flatly contradicted the testimony of B. After thus seeing and hearing all the witnesses, the master found:

"The affidavit of Besselman on the 10th day of May, 1916 was signed and sworn to by him; that at the time he knew the contents thereof; that the statements contained therein were true; and that his testimony in this case was false, and that the government has failed in its contention that Letters Patent to Joseph H. Adams No. 1,320,354 granted October 28, 1919, on Application Serial Number 530,852, filed December, 1909, were obtained by means of fraudulent and deceptive affidavits and statements."

Our study of the testimony does not justify a disturbance of this unequivocal finding by the trier of fact who saw and heard the witnesses who so flatly contradicted each other.

The same disposition may be made of the government's contention respecting M. W. Kellogg & Co.

Respecting queries 2 and 3, little need be said in view of our ultimate conclusion as to the validity of the patents. This court is divided respecting the right of the government to attack the validity of the patents in these proceedings. We are satisfied, however,

that we may inquire into the prior art to ascertain the scope of the claims of the various patents involved.

■ Having made that study, we conclude that: (a) All of the patents cover improvements only. (b) None of them are basic or pioneer patents. (c) All claims should be construed accordingly.

■ It by no means follows, however, that, because the claims of a patent merely cover improvements, and must be denied a wide range of equivalency, they are unimportant, or that the inventor did not make a real contribution to the art. Moreover, if a narrow patent is valid, it furnishes as sufficient a consideration for a contract based on it as would a pioneer or basic patent, and it is as legitimate a subject of cross-license agreement as is a basic or pioneer patent.

Without discussing each patent at length and in detail, we will content ourselves with a statement of our conclusion. For the purposes of this suit, we are not willing to disturb the master's finding that the patents are valid.

*Validity of Agreements.* Seventy-nine agreements are involved. They may be referred to for convenience sake as cross-licensing and sublicensing agreements, although some of them include provisions that deal with subjects other than licenses.

Opposing counsel approach the consideration of them from different angles. Petitioner asserts that all of the provisions of all agreements must be read together, while defendants contend that the validity of each provision must be separately considered and its legality determined without regard to its effect upon any of the parties other than those who executed the agreement.

Petitioner contends that the primary defendants restrained trade and commerce in cracked gasoline; that such control is obtained through the so-called cross-license agreements; that by such agreements the parties thereto secure an unauthorized extension of the patent monopoly both as to time and subject-matter, and an avoidance of any attack upon the validity of the patents by any of the defendants. It also, so it is asserted, restricted production, destroyed competition, imposed unjustifiable royalties, and restricted the use of the process by others to the detriment of the consumer.

Defendants contend that the grant of a patent is a grant of a monopoly; that, while such a monopoly is a burden on commerce, it is a lawful burden; that the owner of a patent may grant licenses thereunder, few or many, and the effect of each license agreement is to partially lift the lawful monopoly evidenced by the patent. In short, it is argued, licenses promote, instead of restrict, competition, and the license agreements, no matter what their conditions may be, necessarily extend the freedom to manufacture and to sell the patented article. They therefore contend their agreements are not within the condemnation of the Sherman Anti-Trust Law (15 USCA §§ 1–7, 15).

■ The ownership of a patent unquestionably carries with it certain rights, monopolistic in character. Nevertheless the owner of a patent can use it as property only subject to the Sherman Anti-Trust Law. That is to say, A, B, C, and D cannot legally contract respecting their patents in violation of the terms of this law. The patent may confer a right which, distinct from the agreement, is in the nature of a monopoly. To this extent the Sherman Anti-Trust Law does not apply to patent monopolies. And, of course, this right to enjoy a patent monopoly carries with it certain rights incident thereto. Among them are the right to royalties, to grant licenses, as well as the right to handicap competitors by withholding licenses.

As the owner of a patent, one may exclusively occupy the field covered by the patent. He may contract as an incident thereto. He may license one and refuse to license another. But he cannot, merely because of his ownership of a patent, enter into an agreement with another party, perhaps also the owner of a patent, which has for its object or its inevitable result, the burdening of commerce or the lessening of competition *beyond the limits of the patent monopoly.* American Column & Lumber Co. et al. v. United States, 257 U. S. 377, 42 S. Ct. 114, 66 L. Ed. 284, 21 A. L. R. 1093; United States v. Motion Picture Patents Co. et al. (D. C.) 225 F. 800, 810; United States v. New Departure Mfg. Co. et al. (D. C.) 204 F. 107; Standard Sanitary Manufacturing Co. v. United States of America, 226 U. S. 20, 48, 33 S. Ct. 9, 14 (57 L. Ed. 107). We quote from the opinion in the last cited case:

"The trade was, therefore, practically controlled from producer to consumer and the potency of the scheme was established by the co-operation of 85 per cent. of the manufacturers and their fidelity to it was secured not only by trade advantages, but by what was practically a pecuniary penalty, not inaptly termed in the argument, 'cash bail.' The royalty for each furnace was $5.00, 80 per cent. of which was to be re-

turned if the agreement was faithfully observed; it was to be 'forfeited as a penalty' if the agreement was violated. And for faithful observance of their engagements the jobbers, too, were entitled to rebates from their purchases. It is testified that 90 per cent. of the jobbers in number and more than 90 per cent. in purchasing power joined the combination.

"The agreements clearly, therefore, transcended what was necessary to protect the use of the patent or the monopoly which the law conferred upon it. They passed to the purpose and accomplished a restraint of trade condemned by the Sherman law.·

"* * * The added element of the patent in the case at bar cannot confer immunity from a like condemnation, for the reasons we have stated. And this we say without entering into the consideration of the distinction of rights for which the Government contends between a patented article and a patented tool used in the manufacture of an unpatented article. *Rights* conferred by patents are indeed very definite and extensive, but they do not give any more than other rights an universal license against positive prohibitions. The Sherman law is a limitation of rights, rights which may be pushed to evil consequences and therefore restrained.

"This court has had occasion in a number of cases to declare its principle. Two of those cases we have cited. The others it is not necessary to review or to quote from except to say that in the very latest of them the comprehensive and thorough character of the law is demonstrated and its sufficiency to prevent evasions of its policy 'by resort to any disguise or subterfuge of form,' or the escape of its prohibitions 'by any indirection.' United States v. American Tobacco Co., 221 U. S. 106, 181 [31 S. Ct. 632, 649 (55 L. Ed. 663)]. Nor can they be evaded by good motives. The law is its own measure of right and wrong, of what it permits, or forbids, and the judgment of the courts cannot be set up against it in a supposed accommodation of its policy with the good intention of parties, and it may be, of some good results. United States v. Trans-Missouri Freight Asso., 166 U. S. 290 [17 S. Ct. 540, 41 L. Ed. 1007]; Armour Packing Co. v. U. S., 209 U. S. 56, 62 [28 S. Ct. 428, 52 L. Ed. 681]."

Applying this rule to the instant suit, it is apparent that defendants were permitted to execute cross-licenses to one another. They were not, however, under the name and guise of license agreements, permitted to enter into agreements the effect of which was to extend their monopoly beyond the limitations which were fixed by the patent grant. Or, to express it differently, where the contract would be illegal because of violation of the Sherman Anti-Trust law, were it not for the existing patents, the illegality is eliminated merely to the extent of the monopoly represented by the patent grant and to rights which necessarily flow therefrom.

Before examining the agreements and applying this validity test, the following facts constitute a necessary background.

*Gasoline.* Gasoline produced by the pressure cracking process may be used separately or freely mixed with the same product manufactured by any of the other processes. In other words, the product—gasoline—is the same for all practical purposes, whether produced by pressure cracking or by the straight run or other processes. *Gasoline, however produced, is not a commodity covered by a patent.*

The percentage of gasoline produced by the cracking process has increased steadily during the last fifteen years. Not less than 25 per cent. of all gasoline manufactured in the United States was in 1925 produced by pressure cracking processes, and this percentage is constantly increasing.

*Volume of Business.* The master found that "the aggregate cracking *capacity* of all the defendants (primary and secondary) is about 55 per cent. of the total cracking capacity in the United States." Petitioner asserts that the "primary defendants in 1921 *produced* 72.96 per cent. of all cracked gasoline refined in the United States while in 1924 they *produced* 81.05 per cent.;" that in 1921 the primary defendants and their licensees refined 86.39 per cent. while in 1924 the same parties refined 93.96 per cent. of all cracked gasoline produced in the country. It is the actual production rather than "cracking capacity" that is significant. To ascertain whether a monopoly exists we must look to the production rather than the capacity percentages.

*Infringements of Patents by Primary Defendants.* The defendants contend, and the master found, that the cross-license agreements were made in good faith and to avoid patent infringement suits.

It appears, however, that the principal patents of the primary defendants which are the subject of the cross-license agreements may each be practiced without infringing the other. For example, the so-called Burton patents of the Standard Oil of Indiana are not infringed by the Holmes-

Manley process of the Texas Company nor the Cross patents of the Gasoline Products Company, nor by the Tube-and-Tank process. Subsequent to the execution of the agreements, each of the primary defendants continued to follow the teachings of its own patent. The processes described in the claims of many patents were not adopted by any primary defendant not the owner of such patents. Some of the claims of some of the patents are not followed by any of the primary defendants.

### The Agreements.

We herewith quote excerpts from agreements Nos. 31, 55, and 74:

### Agreement No. 31.

"Section 1. That the term 'patent rights' as used in this agreement refers to all issued United States patents and pending applications therefor specified in Schedules A and B and all inventions relating to processes and apparatus for the manufacture of gasoline and other light oils by cracking under pressure, and relating to the products and by-products of such processes and apparatus, and relating to processes and apparatus for refining such products, acquired prior to January 1, 1937; also all future United States patents or divisible patent rights of the same general nature acquired by either party (directly or indirectly) prior to January 1, 1937; together with any and all inventions and improvements disclosed in said patents and applications, or pertaining thereto.

"Section 2. The Indiana Company acknowledges the validity of all patents of the said Texas Company as and when issued under which it becomes licensed hereunder. The Texas Company acknowledges the validity of all patents of the Indiana Company as and when issued under which it becomes licensed hereunder.

"Section 3. Each party hereto grants to the other an irrevocable and non-exclusive license to employ said patent rights in its own plants and those of its subsidiaries, said license to continue to the expiration of any patents included within the aforesaid patent rights. All subsidiaries and controlled companies shall continue to pay royalties if licensed under said patent rights at the time they shall become subsidiaries or controlled companies as defined herein.

"Section 5. The Indiana Company shall be at liberty to modify the terms of, or grant substitutes for, any of its licenses now in force (excepting the licenses of the White

Eagle and Ætna Refining Companies, which licenses shall not be altered except by mutual consent of the parties hereto), provided that the Indiana Company shall not in such substitute licenses reduce the royalty rate below ⁹⁄₁₀ cents per gallon of stock charged to the pressure stills, and shall not fix any maximum without the consent of the Texas Company except under the following conditions:

"(a) The license shall provide that the licensee shall not avail itself of the patent rights of the Texas Company conveyed by said license, or any additional patent rights extended to it, so as to materially increase the yield of light hydrocarbons from a given quantity of charging stock or materially to increase the conversion capacity of a still of a given size, without an adjustment of royalty rates by mutual agreement of the parties to the license before the licensee shall be permitted commercially to employ said inventions;

"(b) The maximum royalty per year on each still shall not be reduced below $56\frac{1}{4}$ cents per gallon of charging capacity of the stills, as defined in Section 10 of the form of license attached.

"Section 6. Either party shall be at liberty to grant licenses under the patent rights of both parties, but only upon terms and conditions mutually agreed upon by the parties. It is agreed that the forms of license hereto attached for the processes and locations therein shown are satisfactory.

"Section 13. The Texas Company agrees that, if at any time prior to January 1, 1937, the amount of gasoline manufactured by it by pressure cracking within the States of Indiana, Illinois, Iowa, Kansas, Minnesota, Michigan, Wisconsin, Missouri, North Dakota, South Dakota, Nebraska, Montana, Wyoming, Colorado and Oklahoma shall exceed twenty-five per cent. (25%) of the gasoline manufactured by the Indiana Company through operations of the same character in said territory, then the Texas Company agrees that the Indiana Company shall have an option to purchase one-third ($\frac{1}{3}$) of such excess manufacture; the amount of such manufacture to be determined and said option to be exercised upon the terms and conditions following:

"(a) Each company shall upon request furnish the other a statement at the end of the first six months of any year covering its said manufacture in said territory and said six months' period shall be taken as the basis in determining the percentages hereunder.

"(b) Notice of the exercise of said option to purchase shall be given by the Indiana Company to the Texas Company on or before the 1st day of October following the said six months' period.

"(c) Deliveries shall begin with the month of January following the exercise of said option by the Indiana Company and shall continue in approximately equal monthly instalments through the calendar year.

"(d) The price to be paid by the Indiana Company to the Texas Company shall be the wholesale price for such gasoline at the time of delivery to be fixed by agreement between the parties hereto; or, in the event of their inability to agree, then such price shall be determined by arbitration, each party selecting one arbitrator, and these two shall select a third. The decision of a majority of the board of arbitration so constituted shall be final and binding upon both parties hereto. Such arbitrators, in arriving at a decision, shall, among other factors, take into consideration the Chicago tank wagon market price of the Indiana Company for its gasoline, the cost of transportation, the cost of marketing, and a reasonable selling profit.

"(e) The quality of the gasoline to be delivered to the Indiana Company, in the event it shall exercise its option to purchase, shall be equal to that being marketed generally by the Indiana Company at the time of such delivery throughout said territory under the brand of 'Red Crown.'

"(f) In the event this Section #13 shall for any reason be held unenforceable, such holding shall not affect or extend to the contract as a whole, or any of its other provisions, which shall, nevertheless, remain in full force and effect."

### Agreement No. 55.

This agreement was entered into between the Texas Company and the Gasoline Products Company on January 26, 1923, and referred particularly to 43 patents or patent applications. Among the provisions are:

(2) "The term 'patent rights' for the purpose of this agreement shall be deemed to mean, in the case of each party, all United States Letters Patent and pending applications therefor specified in Schedules A or B, as the case may be, and all inventions relating to processes and apparatus for the manufacture of gasoline and other light oils by cracking under pressure, and relating to the products and by-products of such processes and apparatus, and relating to processes and apparatus for refining such products, acquired prior to January 1, 1937; also all future United States patents or divisible patent rights of the same general nature acquired by either party (directly or indirectly) prior to January 1, 1937, together with any and all inventions and improvements disclosed in said patents and applications, or pertaining thereto."

(3) "The term 'stock charged' as used for the purpose of this agreement, shall be deemed to mean petroleum or petroleum oils of whatever character, including cycled stock, charged into the pressure equipment."

(6) "The Gasoline Company agrees for itself and its assigns not to make any charge of infringement of its patent rights, or bring any suit for an injunction or damages for infringement of its patent rights against either the Texas Company or any present or future licensee under the patent rights of The Texas Company, including the Standard Oil Company (Indiana), and its present or future licensees who are or shall be licensed under the Texas Company's patent rights, charging infringement under the patent rights of the Gasoline Company, by reason of the practice, past or future, of any process in which the cracking occurs only with substantial distillation, or of any cracking process operated entirely below 450 lbs. pressure per square inch."

(7) "The Gasoline Company shall have the right to grant a non-exclusive license to any of its present licensees under the patent rights of The Texas Company, but limited to manufacture and use by such licensees in installations in which the cracking is performed only by said Cross Process, the manufacture, use and sale of the apparatus for such installations, and/or the sale of the products of such manufacture and use, upon the payment to The Texas Company of whichever is the greater of (a) 2 cents per barrel stock charged or (b) 30% of the total money collected from such licensees by the Gasoline Company as royalty or damages for operations beginning 30 days after the date of this agreement. In the case of the Indian Refining Company the payment shall be either 1 cent per barrel stock charged or 30% of said total money, whichever is greater.

"The Gasoline Company shall have the right also to grant to its future licensees a non-exclusive license under the patent rights of The Texas Company, but limited to manufacture and use by such licensees in installations in which the cracking is performed only by said Cross Process, the manufacture, use and sale of the apparatus for such installations, and/or the sale of the products of such

manufacture and use, upon the payment to The Texas Company of whichever is the greater of (a) 2.4 cents per barrel of stock charged or (b) 30% of the total money collected from such licensees by the Gasoline Company as royalty or damages for any operations subsequent to the issuance of such license."

(8) "The Texas Company agrees to open negotiations with the Standard Oil Company (Indiana), and/or the Standard Oil Company (New Jersey), and/or the Standard Development Company, to the end of acquiring for the Gasoline Company the right to the latter of conferring upon its licensees, present and future, in addition to the non-exclusive license under the patent rights of the Texas Company, a similar non-exclusive license, limited in the same manner as in the case of the Texas Company, under the hereinafter designated patent rights of said companies respectively.

"If and when the right to grant such limited non-exclusive licenses under either or both of the patent rights defined in the following paragraphs designated (a) and (b), shall become vested in the Gasoline Company from the owners thereof, or either of them, the Gasoline Company shall be obligated to pay to the Texas Company an additional 10% of the total money collected by the Gasoline Company from its present licensees as royalty or damages for operations beginning 30 days after the date of the vesting of such rights:

"If and when the right to grant such limited non-exclusive licenses, under all United States Letters Patent, pending applications therefor and all inventions relating to processes and apparatus for the manufacture of gasoline and other light oils by cracking under pressure, and relating to the products and by-products of such processes and apparatus, and relating to processes and apparatus for refining such products, now owned or acquired prior to January 1, 1937, by the Standard Oil Company (Indiana), also all future United States patents or divisible patent rights of the same general nature acquired by the Standard Oil Company (Indiana) (directly or indirectly) prior to January 1, 1937, together with any and all inventions and improvements disclosed in said patents and applications, or pertaining thereto, shall become vested in the Gasoline Company from the Standard Oil Company (Indiana) the Gasoline Company shall be obligated to pay to the Texas Company an additional sum from its future licensees of whichever is the greater of: (a) 1.2c per barrel charged, or (b) 10% of the total money collected by the Gasoline Company from such future licensees as royalty or damages for any operations beginning 30 days after the vesting of such rights.

"The Gasoline Company shall in any event be obligated to pay to the Texas Company not less than the following percentages of the total money collected by the Gasoline Company from its present and future licensees under any or all of the patent rights of the Gasoline Company as royalty or damages for operations within the United States beginning at the times specified and continuing during the life of this agreement.

"(a) Not less than 30% collected from each of the present and future licensees from the date hereof;

"(b) Not less than 40% collected from each of the present licensees beginning 30 days after the right to grant limited non-exclusive licenses under the patent rights of either or both of the Standard Oil Company (Indiana), and the Standard Oil Company (New Jersey) and the Standard Development Company shall have been vested in the Gasoline Company as hereinbefore provided;

"(c) Not less than 40% collected from each of the future licensees beginning 30 days after the right to grant limited non-exclusive licenses under the patent rights of the Standard Oil Company (Indiana), shall have been vested in the Gasoline Company as hereinbefore provided;

"(d) Not less than 40% collected from each of the future licensees beginning 30 days after the right to grant limited non-exclusive licenses under the patent rights of the Standard Oil Company (NJ) and the Standard Development Company shall have been vested in the Gasoline Company as hereinbefore provided;

"(e) Not less than 50% collected from each of the future licensees beginning 30 days after the right to grant limited non-exclusive licenses under the patent rights of both the Standard Oil Company (Indiana) and the Standard Oil Company (New Jersey) and the Standard Development Company shall have been vested in the Gasoline Company as hereinbefore provided."

### Agreement No. 74.

Agreement No. 74, entered into between Standard Oil Company of New Jersey, Standard Oil Company of Indiana, and The Texas Company, September 28, 1923:

"Section III. (a) Jersey licenses Texas and Indiana under its patent rights, excepting that no license is hereby granted for the

Tube-and-Tank Process. Jersey agrees that it will on request license Indiana and/or Texas and their respective 100% subsidiaries only under its patent rights for the Tube-and-Tank Process at five cents per barrel of oil throughput.

"(b) Texas and Indiana license Jersey, Standard Oil Company of Louisiana and Humble Oil & Refining Company under their (Texas and/or Indiana) patent rights except that no license is hereby granted for the Holmes-Manley and/or Burton Processes. Texas and Indiana agree that they will on request license Jersey and its 100% subsidiaries and Humble Oil & Refining Company, under their patent rights for the Holmes-Manley Process, at 8.4 cents per barrel of oil, fresh stock.

"(c) Indiana and Texas agree to extend the present temporary modified license contracts running from Indiana to Jersey and to Standard Oil Company of Louisiana until December 1, 1931, and to license Jersey and Standard Oil Company of Louisiana, but no other or future subsidiary of Jersey, under their (Indiana and Texas) patent rights for the practice of the Burton Process thereafter, royalty free."

"Section V. (a) Jersey agrees to deliver to Texas upon the execution hereof a duly executed copy of a certain grant running to Gasoline Products Company, Inc., a copy of which is attached as Exhibit A.

"(b) Texas agrees to deliver to Jersey upon the execution hereof a duly executed copy of a certain grant running to Jersey from Gasoline Products Company, Inc., a copy of which is attached as Exhibit B.

"(d) Each party agrees that it will not in the future grant any license or release under the patent rights of any other party hereto (without its consent) to one who at that time holds (of record) or is actually known to the licensor to own or control patent rights which are infringed by the pyrolitic cracking operations of said other party hereto."

"Section VII. (a) Jersey agrees to pay to Indiana one-half of all royalties received by it (and/or its 100% subsidiaries) after the effective date hereof from licensees of the Tube-and-Tank Process (under any or all the patent rights of Texas and/or Indiana), or five cents per barrel of oil (throughput) run by such licensees, whichever is the greater, such payments to be made when and as such royalties are collected, expenses of collection, if any, to be borne equally by Jersey and Indiana provided that

"(1) All present licensees of Jersey shall be considered to be licensees under the patent rights of Indiana and Texas, but in the case of existing license contracts Jersey shall pay only one-half of the royalties received after the effective date hereof by it, and in the case of existing license contracts made according to the plan and at the rate of Exhibit D attached hereto, such payment shall be subject to being returned to Jersey for return to the licensees to the extent and under the conditions provided in Exhibit D.

"(2) Jersey shall make no payment to Indiana and/or Texas for any royalties it receives from Indiana and/or Texas in the event they exercise the option given to them in Section III, paragraph (a) hereof, to take a license under the Tube-and-Tank Process.

"(3) In the event Indiana and/or Texas shall in the future establish a rate of royalty less than 16.8 cents per barrel fresh stock, or 25 per cent. of the net profit, then Jersey shall be privileged to reduce its minimum payment of 5 cents per barrel proportionately to the reduction in royalty made by Indiana or Texas.

"(4) The Standard Development Company, a patents holding subsidiary of Jersey, may collect royalties from Jersey, Standard Oil Company of Louisiana, and from the Humble Oil & Refining Company without accounting or payment of any kind to Indiana or Texas.

"(b) Jersey shall pay to Indiana in any case not less than one-half of all moneys received from any future licensees of the Tube-and-Tank Process, such payments to be made when and as such royalties are collected, expenses of collection, if any, to be borne equally by Jersey and Indiana.

"(c) Indiana agrees to pay to Texas one-fourth of all royalties paid after the effective date hereof to Indiana by Jersey and Standard Oil Company of Louisiana for operations under the Burton Process, within 30 days from the date such royalties are received, and Texas agrees to pay said one-fourth of said royalties to the Standard Development Company within 15 days after the date on which it is received by Texas from Indiana."

■ Section 13 of agreement 31 is cited by petitioner as one covenant of this contract which violates the Sherman Act. It obligates the Texas Company to sell, under certain conditions, gasoline by it manufactured to the Standard Oil Company of Indiana. It is not restricted to gasoline manufactured by any process covered by any patent. This covenant clearly violates the Sherman Act.

■ A patentee may, as against its agent or licensee, impose conditions respecting sales, the price and the territory whereat and

wherein the patented article may be sold. United States v. General Electric Company, 272 U. S. 476, 47 S. Ct. 192, 71 L. Ed. 362. For the purpose of this argument, it may be conceded that such restrictive covenant may include a commodity which, though not covered by a patent, is the product of a patented process. But such covenant cannot include an unpatented article not made by patentee's patented process or apparatus. The vice of this covenant lies in the fact that there is no restriction as to the commodity which was the subject of the agreement. The product was gasoline manufactured by pressure cracking, irrespective of the process used in producing it.

The defendants asserted, however, that this covenant never has been, and never will be, enforced, and therefore is of no significance. When this statement was made on oral argument, the court suggested, in order to test the good faith of defendants' assertion, that the parties agree to its elimination. Defendants accepted the suggestion, and filed with the court an agreement in the nature of a waiver of this provision of agreement 31. To this action, the petitioner strenuously objected, insisting that defendants should not be permitted to avoid the effect of this litigation by an eleventh hour withdrawal from its previously asserted right to thus contract. Were this the only provision objected to, we would view the litigation as happily ended. But there are other agreements which are attacked, and, if the attacks be sustained, a decree for petitioner must necessarily follow.

■ For example, sections 1, 2, 3, and 4 of this same agreement 31 provide that the contracting parties shall acknowledge the validity of all patents that may be issued to the other "as and when issued under which it becomes licensed hereunder." Section 1 of the same agreement defines the term "patent rights" as including all patents and pending applications "and all inventions relating to processes and apparatus for the manufacture of gasoline and other light oils by cracking under pressure, acquired prior to January 1st, 1937." Section 3 grants, each to the other, licenses to continue to the expiration of any patents included within the aforesaid "patent rights."

These agreements do not expire until 17 years from January 1, 1937. Or, stated in another way, the agreement which was made August 26, 1921, protected patents from attack which might be issued as late as January 1, 1937, and which would not expire until 1954.

Such agreements cannot be sustained. While a patent is presumptively valid, many of them, although duly issued, are invalid for various reasons. The public, in whose interest the patent laws are enacted (Kendall v. Winsor, 21 How. 322, 16 L. Ed. 165), is ordinarily protected against the burden of such void patent grants by the action of competitors of the patentee who, prompted by motives of self-preservation, refuse to recognize these void patents, and therefore successfully contest them. The public is thereby relieved of the burden which their existence entails.

By these clauses of agreement 31 and similar clauses in the other agreements, the parties purchased immunity from attack on their patents. Tying the hands and sealing the lips of the only parties who would ordinarily stand suit and contest the validity of the patents, the primary defendants attempted to fasten on the public burdens which it was not the purpose of the patent law to impose. Such agreements violate the letter and the spirit of the patent law, and are contrary to public policy. The far-reaching consequences of such agreements is illustrated by the present case.

■ Further attack upon this agreement is made because of the effect of subsequently executed agreements, which not only dealt with royalties, but enlarged the scope of this agreement by including other defendants who were large producers and refiners of gasoline. Agreements 55 and 74 include the other two primary defendants, the Standard Oil of New Jersey and the Gasoline Products Company. Section 8 of agreement 55 obligated the Texas Company to open negotiations with the Standard Oil of Indiana and Standard Oil of New Jersey " * * * to the end of acquiring for the Gasoline Products Company the right of conferring upon its licensees, present and future, in addition to the non-exclusive patents under the license rights of the Texas Company a similar non-exclusive license from the Standard Oil Company of Indiana and the Standard Oil Company of New Jersey."

Agreement 55 dealt with and fixed the royalties which were to be charged, and provided for a division of these royalties between the primary defendants. The plan is made more effective by the two other agreements, 73 and 75, the first being between Standard Oil Company of New Jersey, Standard Oil Company of Indiana, and the Texas Company, and the latter agreement being between the Standard Oil Company of New Jersey and the Gasoline Products Company.

In determining their validity, these various agreements must be read together. They interlock. Swift & Co. v. United States, 196 U. S. 396, 25 S. Ct. 276, 49 L. Ed. 518. Viewed as one, they present a situation where the primary defendants not only fixed royalties as between themselves but for their sub-licensees, and provided for a division among themselves of the moneys received from such royalties.

There appears no logical relation between the protection which attached to the exclusive *right* which arose from the issuance of the patents and the agreements which the holders of the patents generally entered into. The agreements therefore transcend what was necessary to protect the patents, and come within the prohibition of the Anti-Trust Act.

It may be conceded that A may fix the royalty which he shall exact from B as arbitrarily as he chooses. Such patentee may even, *within a limited field*, grant such licenses upon condition that his competitor execute to him a license to use said competitor's patented process. But such patentees may not, when to a large degree they dominate the trade, enter into an agreement for the pooling of their royalties, and thereby increase the tribute exacted from the users.

To illustrate: A has a valid patent used by numerous licensees. B has a valid patent which other licensees use. Notwithstanding A and B each has a monopoly, there is competition between them. But it would be a plain violation of the Anti-Trust Act for A and B, thus having certain monopolies which are in competition one with another, to combine to eliminate competition between their monopolies and impose or maintain burdens which would exist, not by virtue of the monopolies, *but by virtue of the agreements dealing with their monopolies as property*.

It is in this respect that these various agreements step outside the limits of lawful monopolies which arose from the issuance of the patents. The patent monopoly itself is a property right, and *agreements* in respect thereto must be subject to the same anti-monopoly tests as any other property rights.

There is no substantial difference between agreements entered into by competing packing companies respecting the prices at which, or territories wherein, their products may be sold and an agreement between holders of patent monopolies which fix the rates of royalties that shall be charged to licensees.

In fact, we may go further and say that pooling agreements between holders of patents whereby royalties are fixed and the division of proceeds derived from royalties provided for are within the condemnation of the Sherman Anti-Trust Law. True, in such cases, the court must inquire into the effect and extent of such agreements. But, if the evidence, as here, discloses a domination of the trade and an additional burden by virtue of the agreement, the act is violated.

And there can be no legitimate question respecting the extent of the domination by the primary defendants. Whether we accept petitioner's version of the testimony or the defendants' statement of the extent to which these defendants dominate the industry, the conclusion must be the same. In either case the percentage is so large as to necessitate the conclusion that the royalties materially and substantially affect the price of gasoline.

In so far as these agreements are license agreements, they are unobjectionable. To the extent that they go beyond license agreements, they are subject to the inhibitions of the Sherman Act.

It is worthy of note that none of the primary defendants use any considerable number of the patents of the other. This is established by the admission of the defendants. An independent producer, however, could hardly engage in the process of refining gas by a cracking process without infringing one or more of the patented cracking processes. One such refiner might infringe the process of one primary defendant while another independent refiner would run afoul of another patent. Under these circumstances, the holders of the patent in fixing royalties by agreement, are in effect, and for all practical purposes, entering into an agreement to fix prices. For it is affirmatively established that the royalties fixed *in* the agreements and maintained *by* the agreements is a substantial part of the cost of refining. In fact, the evidence justifies a finding that such royalties nearly equal, and sometimes exceed, the profits of outside refiners.

If, then, the royalty charges directly affect the price at which the commodity can be produced, and if the agreements have for their object or for their necessary effect the fixing and maintaining of royalties, they cannot be distinguished from other agreements which have been condemned, the purpose or necessary result of which was to fix the price of a commodity. United States v. Trenton Potteries, 273 U. S. 392, 397, 398, 47 S. Ct. 377, 379 (71 L. Ed. 700, 50 A. L. R. 989). The court there said:

"The aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition. The power to fix

prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices. The reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow. Once established, it may be maintained unchanged because of the absence of competition secured by the agreement for a price reasonable when fixed. Agreements which create such potential power may well be held to be in themselves unreasonable or unlawful restraints, without the necessity of minute inquiry whether a particular price is reasonable or unreasonable as fixed and without placing on the government in enforcing the Sherman Law the burden of ascertaining from day to day whether it has become unreasonable through the mere variation of economic conditions. Moreover, in the absence of express legislation requiring it, we should hesitate to adopt a construction making the difference between legal and illegal conduct in the field of business relations depend upon so uncertain a test as whether prices are reasonable—a determination which can be satisfactorily made only after a complete survey of our economic organization and a choice between rival philosophies. Compare United States v. Cohen Grocery Co., 255 U. S. 81 [41 S. Ct. 298, 65 L. Ed. 516, 14 A. L. R. 1045]; International Harvester Co. v. Kentucky, 234 U. S. 216 [34 S. Ct. 853, 58 L. Ed. 1284]; Nash v. United States [229 U. S. 373, 33 S. Ct. 780, 57 L. Ed. 1232], supra. Thus viewed, the Sherman Law is not only a prohibition against the infliction of a particular type of public injury. It 'is a limitation of rights, * * * which may be pushed to evil consequences and therefore restrained.' Standard Sanitary Mfg. Co. v. United States, 226 U. S. 20, 49 [33 S. Ct. 9, 15 (57 L. Ed. 107)]."

Defining the term "unreasonable," the court says:

"That only those restraints upon interstate commerce which are unreasonable are prohibited by the Sherman Law was the rule laid down by the opinions of this Court in the Standard Oil and Tobacco cases. But it does not follow that agreements to fix or maintain prices are reasonable restraints and therefore permitted by the statute, merely because the prices themselves are reasonable. Reasonableness is not a concept of definite and unchanging content. Its meaning necessarily varies in the different fields of the law, because it is used as a convenient summary of the dominant considerations which control in the application of legal doctrines.

Our view of what is a reasonable restraint of commerce is controlled by the recognized purpose of the Sherman Law itself. Whether this type of restraint is reasonable or not must be judged in part at least in the light of its effect on competition, for whatever difference of opinion there may be among economists as to the social and economic desirability of an unrestrained competitive system, it cannot be doubted that the Sherman Law and the judicial decisions interpreting it are based upon the assumption that the public interest is best protected from the evils of monopoly and price control by the maintenance of competition. See U. S. v. Trans-Missouri Freight Association, 166 U. S. 290 [17 S. Ct. 540, 41 L. Ed. 1007]; Standard Oil Co. v. United States [221 U. S. 1, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734], supra; American Column Co. v. United States, 257 U. S. 377, 400 [42 S. Ct. 114, 66 L. Ed. 284, 21 A. L. R. 1093]; United States v. Linseed Oil Co., 262 U. S. 371, 388 [43 S. Ct. 607, 67 L. Ed. 1035]; Eastern States Lumber Association v. United States, 234 U. S. 600, 614 [34 S. Ct. 951, 58 L. Ed. 1490, L. R. A. 1915A, 788]."

The petitioner is entitled to a decree in its favor in accordance with the views hereinbefore expressed. Counsel for both parties will confer upon the terms of such decree before submitting it to the court. If unable to agree as to its terms, it will be presented to this court on due notice.

ANDERSON, Circuit Judge. I am unable to concur in the views expressed by the majority of the court. In my judgment, the government's exceptions to the master's report should be overruled, the master's report should be approved, and a decree entered dismissing the bill.