## GASOLINE PRODUCTS CO., Inc., v. CHAMPLIN REFINING CO.

### Nos. 1180, 1186.

District Court, D. Maine, S. D.

Jan. 20, 1931.

Taylor, Blanc, Capron & Marsh, of New York City, and Verrill, Hale, Booth & Ives, of Portland, Me., for plaintiff.

Beane & Beane, of Augusta, Me., Bradley, Linnell & Jones, of Portland, Me., and McKeever, Moore & Elam, and Harry O. Glasser, all of Enid, Okl., for defendant.

PETERS, District Judge.

The above two suits were heard together by me without a jury by virtue of a stipulation to that effect. The suits are to recover for royalties due under a license agreement whereby the plaintiff granted to the defendant a nonexclusive license under letters patent owned by the plaintiff and others to construct and operate at its plant in Oklahoma two Cross cracking units for cracking petroleum oils. The amount of royalties covered by the two suits, as stipulated by the parties, aggregates upwards of $200,000. The two suits will be treated as one for the purposes of this discussion.

The defendant admits execution of the license agreement, construction of the Cross cracking units thereunder, operation of them during the time described in the plaintiff's writs, and the treatment therein of the number of barrels of oil as claimed by the plaintiff; and also admits its agreement to pay royalties on the oil at the rate of 10 cents per

barrel. The only controversy between the parties is one based on the alleged illegality of the license agreement, the defendant in its plea alleging that the plaintiff and other corporations, prior to the date of the license contract sued on, were "and thereafter continued to be parties to an illegal combination in restraint of trade and in violation of Sections 1 and 2 of the Sherman Anti-Trust Act," wherein plaintiff and others in effect fixed prices for cracked gasoline and controlled the markets by fixing the royalties to be charged and provided for a division of royalties among the plaintiff and others, and by other means did the said corporations "step outside the limits of lawful monopolies which arose from the issuance of the patents held by them, by fixing the rates of royalty to be charged to licensees, by pooling the agreements between the holders of said patents whereby said royalties are fixed and the division of the profits derived therefrom among said plaintiff and said aforenamed corporations"; further charging that the plaintiff was in conspiracy with others to form a monopoly to realize "huge profits by extorting from all manufacturers engaged in the manufacture of cracked gasoline, including this defendant, and under said contract set out by plaintiff herein, large sums of money in the guise of royalties"; that defendant, by virtue of the execution of the contract sued on, became a licensee of said illegal combination, and that the royalties sought to be collected are a part of the royalties plaintiff seeks to assess and divide with other corporations in the combination, and "that said contract is a result and a part of the fruits of said illegal combination and violation of Sections 1 and 2 of the Sherman Anti-Trust Act, * * * and that it is therefore illegal, void and unenforceable."

The plea also alleges that defendant, in order to continue operation of its cracking plant, was virtually compelled to execute the license agreement and to pay exorbitant royalties fixed thereby, or else execute a similar agreement with some other member of the combination, and that without such a license could not continue the manufacture of cracked gasoline; that the effect of the license agreement was to make defendant a party to the illegal combination, and it was thus compelled to become a party or discontinue the manufacture of cracked gasoline. And also, evidently anticipating a defense that might be made, the plea alleges that the royalties sued on were not fixed by an independent collateral contract, but with direct reference to and in conformity with and with the object of enforcing the illegal agreements by which the illegal combination was formed, and that the royalties sued for are exorbitant and grossly higher than the defendant would have had to pay had the illegal combination not been in effect.

The defendant under this affirmative defense having assumed the burden of proof and submitted evidence, the plaintiff maintains that there is no evidence of any illegal combination to which it ever became a party, and that, if there were such a combination, it would be no defense in this action which is on a contract collateral to the agreements forming the alleged combination and unaffected by them.

This brings us to consideration of the contract under which the royalties sued for accrued and around which centers the controversy.

The contract is dated February 26, 1926, and opens with a guaranty that the licensor, the plaintiff, is the owner of, or has the right to grant, the nonexclusive license thereby granted under certain patents owned by the plaintiff, the Texas Company, the Standard Oil Company of Indiana, the Standard Oil Company of New Jersey, and the Standard Development Company, and under certain Lewis patents relating to processes for treating hydrocarbons and the products derived therefrom and the apparatus used in connection therewith; and that it has the right to grant licenses under all United States letters patent thereafter acquired by said companies prior to certain dates, which should cover processes and apparatus used or made in the exercise of the license granted. A schedule of numerous letters patent owned by the corporations referred to is annexed to the license.

Article first contains the grant to the defendant of a nonexclusive license to construct and operate two Cross cracking units of a rated capacity of 4,000 barrels throughput of charging stock per twenty-four hours, in which a process of oil conversion therein defined is practiced.

In article second the licensee agrees to construct within one year two units in conformity with plans and specifications furnished by the licensor.

Article third provides for the payment of royalties on the basis of 10 cents a barrel, and provides that the licensee may commute the royalties on payment of a lump sum.

Articles fourth and fifth provide for the mechanics of computing the royalties.

Article sixth provides that, in the event infringement suits are brought against the licensees, the licensor will assume the defense and pay the costs of the defense.

Article seventh provides that improvements on any of the patents, applications, inventions, or processes obtained by the licensee during the continuance of the agreement shall belong to the licensor, subject however to a shop right in the licensee in the event of termination.

Article eighth prohibits assignment of the license without consent and the sale of the units to any person who shall not have agreed to comply with the terms of the license.

Article ninth makes available to the licensee the benefit of any reduction of royalties granted by the licensor to other licensees.

Article tenth provides that the license shall remain in force for the full term of the patents then or thereafter owned by the licensor upon any processes or inventions licensed, unless sooner terminated as provided.

Article eleventh defines the terms used, barrels, gallons, etc.

Article twelfth provides for a termination of the license for breach of its covenants.

Article thirteenth gives the addresses of the parties.

Article fourteenth deals with the rights of successors to the parties.

Article fifteenth contains a clause stating that the agreement embodies the entire understanding between the parties and provides for amendment.

The defendant claims that the illegality of this license contract between it and the plaintiff has already been passed upon and established by the decision of the Special U. S. District Court in Illinois, whose opinion is reported in 33 F.(2d) 617.

Counsel for defendant say, in their brief: "The defense in this case rests upon the case of the United States v. Standard Oil Co. et al," [33 F.(2d) 617], and say that this and other similar contracts offered in evidence in that suit were held by the court to be illegal and void. A study of the opinion of the court in the suit referred to shows that the reasoning and conclusions of the court are directed toward the legality of the so-called primary contracts (being the cross-licenses between the primary defendants) rather than the sublicenses similar to the contract in the instant suit. If, in addition to annulling the primary contracts, by decree in the previous suit, the secondary or sublicense contracts were also declared void, that result would not seem to be required by the reasoning of the court, and in any event would not be conclusive in this case.

The bearing of the opinion in the above case consists in its reasoning and in its formulation of principles of law, so far as they are applicable to the instant case. I cannot, as urged by counsel for defendant, take judicial notice of the facts in the master's report mentioned in that case, nor use that opinion in any way except as an authority.

The evidence introduced by the defendant, in support of its proposition that the license contract sued on is an illegal contract, is avowedly put in as a duplication of the evidence in behalf of the government in the Illinois suit above referred to in the hope that this court will find, in conformity with the position of the court in that case, that an illegal combination in restraint of trade existed between the plaintiff herein and the other so-called primary defendants, and will further find that the connection of the license contract with the illegal combination was such that no recovery can be had upon it. The plaintiff denies that the evidence will authorize the finding of the existence of such an illegal combination and has submitted argument in behalf of its contention. The Illinois case referred to is now pending in the Supreme Court on appeal. 51 S. Ct. 39, 75 L. Ed. ——. If the dissenting judge in the Illinois opinion should be sustained by the Supreme Court, there will be no further ground for the defendant herein to stand on.

But the instant case involves important features other than those involved in the Illinois suit, and I should not regard a judgment affirming the decision in that case as decisive of this case. For that reason I will assume for the purposes of this case that the evidence shows the plaintiff to be a member of an illegal combination, as found in the Illinois case, and try to determine whether, in spite of an illegal connection with the other corporations named, the plaintiff herein can recover on the contract it made with the defendant, a stranger to the combination.

There seems to be nothing unusual in the circumstances connected with the inception of this contract. The defendant having no cracking plant, in February, 1926, decided to install one and had several different patented processes under consideration, including the Dubbs process, the Jenkins process, and the Holmes-Manley process. Representatives of all of them solicited the business of the defendant and it happened that the agent for

this Cross process secured it. Mr. Champlin, the practical owner of the defendant company, says that he was "just hanging in the balance" as to whether to buy a Jenkins or a Dubbs plant.

I find no evidence to substantiate the claim as set up in the pleading of the defendant that "in order to continue operation of its cracking plant (defendant) was virtually compelled to execute the license agreement and to pay exorbitant royalties." Mr. Champlin has testified otherwise as to the compulsion, and I can find no evidence in the case as to whether the royalties agreed upon of 10 cents per barrel were exorbitant or otherwise. The defendant for several years enjoyed the benefits secured by the contract it made with the plaintiff. There were no provisions in the contract prohibiting the licensee from using any other process at will. Its freedom of action was unrestricted.

I find the alleged oppressive effects of this contract on the defendant are not supported by the evidence. The substantial and decisive issue is whether the contract is contrary to public policy or so tainted with illegality as to make it unenforceable.

■ The defendant contends that the contract is permeated with illegality drawn up through its roots in the illegal cross-license contracts between the plaintiff and the other companies, and, being thus inherently illegal, is unenforceable. The plaintiff points out that at worst it is simply a collateral contract entered into with a member of an illegal combination, and under established principles of law enforceable as such, and asks the court to defeat a plain attempt to retain the benefits of a contract and avoid the burdens, which of course the courts will do unless the public interest clearly requires the contrary. "It is only because of the dominant public interest that one, who has had the benefit of performance by the other party, is permitted to avoid his own obligation on the plea that the agreement is illegal. And it is a matter of great public concern that freedom of contract be not lightly interfered with." Steele v. Drummond, 275 U. S. 199, 48 S. Ct. 53, 54, 72 L. Ed. 238.

The defendant relies on the case of Continental Wall Paper Co. v. Voight, 212 U. S. 227, 29 S. Ct. 280, 53 L. Ed. 486. That case must be construed in connection with the case of Connolly v. Union Sewer Pipe Co., 184 U. S. 540, 22 S. Ct. 431, 46 L. Ed. 679; Wilder Mfg. Co. v. Corn Products Co., 236 U. S. 165, 35 S. Ct. 398, 402, 59 L. Ed. 520; Small v. Lamborn & Co., 267 U. S. 248, 45 S. Ct.

300, 69 L. Ed. 597, and other decisions referred to in the latter case. The general rule holds good, as laid down in the Connolly Case, that a voluntary purchaser of property under a collateral and independent contract cannot avoid payment on the ground that the vendor is a member of an illegal combination.

■ Whether this license contract is one collateral to the cross-license agreements by which the alleged illegal combination, including the plaintiff, was formed, or whether the license contract is, in and of itself, illegal, would seem to depend upon the applicability of the Connolly and the Wall Paper Cases to the facts disclosed.

As the contract is admittedly valid on its face, involving the doing of no wrongful act, by its terms an ordinary and legitimate business transaction, between parties authorized to contract, it is apparent that the defendant, who voluntarily entered into it, must go somewhere back of and outside of the contract to show its illegal nature. This it does or attempts to do by pointing out that the combination was formed for the purpose of stifling competition and fixing prices in its cracking business; and that the contract sued on partakes of the illegal purpose of the plaintiff, is an essential part of its wrongful scheme, and is a method of carrying it out and reaping the profits made possible by the monopoly.

The defendant was not a party to the cross-license agreements and I can see no force in the argument that the mere purchase of a sublicense from the alleged illegal combination makes the purchaser a party to it.

The contract in suit is complete in itself, involves the doing of nothing illegal, and is enforceable without reference to any other agreement. I fail to see how there can be any illegality "inherent" in one contract when it is necessary to go wholly outside of it and into another contract to find illegality. I regard it as so held by Chief Justice White in his opinion in Wilder Mfg. Co. v. Corn Products Co., supra. In that case the defendant claimed that the plaintiff being an illegal combination could not recover for goods sold, under the authority of the Wall Paper Case. The court said: "While it clearly appears that this is the contention, it is difficult to precisely fix the ground upon which it is rested. But as the rule of general law which, under ordinary circumstances, does not permit the existence of a corporation to be indirectly attacked, is not assailed, and as it is not asserted that, irrespective of the illegal organ-

ization of the corporation, the contract of sale was inherently unlawful, it follows that the proposition is the one which we have already, in another aspect, disposed of; that is, that the sale and its conditions, although inherently legal, become illegal by considering the illegal corporation and the aid to be afforded to its wrongful purposes by the conditions which formed a part of the sale. But, in substance, this only assumed that it was held in the Continental Wall Paper Case that that which was inherently legal can be rendered illegal by considering in connection with it something where there is no right to consider at all. But it is apparent on the face of the opinion in the Continental Wall Paper Case that it affords no ground for the extreme and contradictory conclusion thus deduced from it, since the ruling in that case was based not upon any supposed right to import into a legal and valid contract elements of wrong which there was no right to consider, but was rested exclusively upon elements of illegality inhering in the particular contract of sale in that case, which elements of illegality may be thus summarized: (a) the relations of the contracting parties to the goods sold, (b) the want of real ownership in the seller, (c) the peculiar obligations which were imposed upon the buyer, and (d) the fact that to allow the nominal seller to enforce the payment of the price would have been, in and of itself, directly to sanction and give effect to a violation of the anti-trust act inhering in the sale."

In the Wall Paper Case the facts were peculiar and different from those in the instant case which are similar in their essentials to those in the Connolly Case, the Wilder Case, the case of Small Co. v. Lamborn & Co., 267 U. S. 248, 45 S. Ct. 300, 69 L. Ed. 597, and many others. In the Wall Paper Case the question considered by the court was whether the plaintiff company could have judgment upon an account which, as admitted by the demurrer, was made up in the knowledge of both seller and buyer with direct reference to and in execution of certain agreements under which an illegal combination, represented by the seller, was organized. As remarked by Chief Justice White in the Wilder Case, "there is no conflict between the Connolly Case and the Continental Wall Paper Case, but it also establishes that both cases, the first directly, and the other by a negative pregnant, demonstrate the want of merit in the contentions here insisted upon."

In the case of American Refining Company v. Gasoline Products Company, Inc., 294 S. W. 967, 974, decided by the Court of Civil Appeals of Texas, practically the same situation as here exists was before the court, the plaintiffs being the same in the original actions and the license contracts practically the same, the contract in the Texas case containing rather more stringent provisions in regard to the use of the licensed process. The court held that the same defense that is made here could not prevail, saying, among other things: "We do not think the mere conclusion of the pleader that 10 cents a barrel was excessive sufficient to outweigh the force of the facts appearing on the face of the pleadings and of the cases allowing a patentee such a wide margin in fixing prices and conditions. These observations apply as well to the limitation of gasoline production to 30,000 gallons a day. The prices charged and limitations noted seem, under the authorities cited, to be not only such as a lessor of the patented article or processes of production can lawfully impose, but also such as can only have an incidental and indirect effect in promoting or furthering the purposes of a previous and separate contract in violation of the anti-trust laws. To taint the subsidiary agreement with the fraud or illegality of the previous one, it must, under the authorities, appear that the enforcement of the latter, directly, and not indirectly, promotes the unlawful purposes contemplated in the execution of the former unlawful agreement"—citing various cases in addition to those referred to herein above.

I come to the conclusion that there is nothing inherently illegal in the contract in suit, and that it is enforceable as an independent collateral contract, even if the plaintiff is a member of an illegal combination.

It follows that judgment should be entered for the amounts sued for, which are admittedly due, to wit the amount of $233,812.-11, with interest thereon from July 8, 1930.