**TURNER GLASS CORPORATION v. HARTFORD-EMPIRE CO.**

No. 9633.

United States Court of Appeals
Seventh Circuit.

March 7, 1949.

John G. Rauch, John M. Kitchen, and Perry E. O'Neal, Patrick J. Smith, and Robert D. Morgan, all of Indianapolis, Ind. (Rauch, Wemmer & Chase and Thompson,

O'Neal & Smith, all of Indianapolis, Ind., of counsel), for appellant.

Harvey A. Grabill and Charles C. Baker, both of Indianapolis, Ind., Stephen H. Philbin, of New York City, Joseph J. Daniels, William G. Davis, Irving M. Fauvre, Hubert Hickam and Alan W. Boyd, all of Indianapolis, Ind., Fred E. Fuller and Leslie Henry, both of Toledo, Ohio, Paul Y. Davis, of Indianapolis, Ind., Henry A. Middleton, of Toledo, Ohio, James A. Ross, of Indianapolis, Ind., and Albert R. Connelly, of New York City (Baker & Daniels, of Indianapolis, Ind., of counsel), for appellees.

Halsey Sayles, of Elmira, N. Y., for defendant, Corning Glass Works.

Before MAJOR, Chief Judge, KERNER, Circuit Judge, and WHAM, District Judge.

KERNER, Circuit Judge.

By this appeal plaintiff challenges the propriety of a judgment dismissing its complaint after a trial upon the merits.

Plaintiff, basing its claim upon a decree entered by the District Court of the Northern District of Ohio, United States v. Hartford-Empire Co., 46 F.Supp. 541, affirmed 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322, and 324 U.S. 570, 65 S.Ct. 815, 89 L.Ed. 1198, hereinafter referred to as the Toledo case, sued defendants to recover $5,000,000 together with treble damages alleged to have been sustained by defendants' violation of §§ 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2, and § 3 of the Clayton Act, 15 U.S.C.A. § 14. In the Toledo case, the court adjudged the defendants, except the Stevenson Corporation, guilty of a conspiracy, combination and monopoly in obtaining and licensing patents in glass making machinery, and in limiting and restricting the use of the machinery.

Plaintiff's complaint alleged a conspiracy substantially in the language of the Toledo complaint, and averred that the restrictive licensing policy of the defendants under their patents, and the royalties and license fees paid by plaintiff to Hartford during the period of the conspiracy, placed plaintiff at a competitive disadvantage which directly caused injury and damage to plaintiff's business and property.

After defendants had filed answers, the cause was referred to a master to take testimony and report the same with his findings of fact, and state his conclusions of law thereon. The master took the testimony of the witnesses, reported more than 13,000 pages of testimony and stipulations, admitted in evidence 1,221 exhibits, and filed his report in which he made 42 findings of fact, among which was one that license fees and royalties had been paid by plaintiff from 1923 to August 4, 1930 under certain license and lease agreements, but concluded that the law was with defendants and recommended that the cause be dismissed. Exceptions to the report were filed and overruled and the report of the master was approved by the court.

The court found inter alia that plaintiff, an Indiana corporation, has, since 1893, been engaged in the manufacture of glass containers, and that prior to 1920 its entire business has been the manufacture of whiskey and beer bottles; that this business was destroyed by the advent of national prohibition, and that plaintiff was obliged to seek other fields of ware or go out of business. It began the production of various kinds of blown glassware, and during 1920, for the purpose of obtaining better operating results, it equipped its plant with automatic feeders manufactured by the Howard Automatic Machine Company. The use of these feeders did not bring satisfactory results.

In 1923 Hartford became the owner of the Howard patents. During the same year, plaintiff, finding its operating results for prior years so unsatisfactory that its officers and stockholders considered closing the plant, sought and obtained the advice of one Hartley. Thereafter, Hartford and plaintiff entered into license and lease agreements for the use by plaintiff of Hartford's patented machinery and for the servicing thereof. Thereafter it received the benefits which resulted from Hartford servicing the machines used by plaintiff, and plaintiff was in a position to obtain Hartford's most improved equipment. One of the first services rendered by Hartley, who later became president of plaintiff, was to obtain an agreement from Hartford to extend credit to plaintiff for new equipment

needed to increase its plant efficiency and production. Acting under Hartley's advice, plaintiff adopted a policy of expansion, sought a wider range of products and an increased production through the acquisition or control of other glassware manufacturers. Favorable results followed. In 1924 it made a net profit of $109,356, and thereafter until the end of the third quarter of 1929 plaintiff had net earnings averaging more than $150,000 per year.

In 1929 the entire glass industry was adversely affected by the severe business depression which began during the summer. Prices declined, and competition became more difficult to meet. Plaintiff decided that it would need improved Hartford equipment in order to speed up and increase its production and reduce overhead costs. It acquired additional feeders and annealing lehrs, in the expectation of obtaining increased volume by concentrating on sales of low-priced ware, and at the end of the first three quarters of 1929 it had earned about $229,000 more than in any prior full year of operation, but for the balance of that year plaintiff suffered steadily mounting losses totalling about $100,000. Losses continued throughout 1930, and by August 1930 it was obvious that plaintiff could not continue unless some method of refinancing could be found. These losses, the court found, could not be attributed to any cause for which defendants had any responsibility or over which they had any control. After a series of negotiations, a meeting of plaintiff's creditors and bondholders was held. Those present agreed that the appointment of a receiver was unavoidable, and a complaint was filed against plaintiff in the United States District Court for the Southern District of Indiana, to which plaintiff filed an answer, and a receiver was appointed. The receiver, having no capital, suspended plant operations and began to arrange a sale. Authority to sell at public auction was procured on December 27, 1930, and on April 3, 1931 the receivership assets were sold subject to confirmation by the court. The court confirmed the sale on April 4, 1931, and thereafter, in May, 1932, the receiver's administration of plaintiff was approved, the receivership proceedings were closed and the receiver discharged.

The court also found that the evidence did not establish that Hartford, Owens, Hazel-Atlas, Corning or Glass Container ever engaged in any conspiracy or violated the United States anti-trust laws except as adjudicated in the Toledo case, or that any of the defendants caused plaintiff's failure or caused any injury to plaintiff's business or property, and that in the Toledo case, Judge Kloeb had held that "the Hartford royalties have been passed on to the ultimate consumer as a part of the price of glassware."

■ In this court, pursuant to plaintiff's request and suggestion that only certain questions of law be considered on this appeal, all of the oral testimony and all of defendants' exhibits were omitted from the record, and it now includes only 38 of the 1,221 exhibits. In this state of the record, we must accept the findings as correct. Carter Oil Co. v. Norman, 7 Cir., 131 F. 2d 451, 456. They cannot be questioned on appeal, United States v. Title Guarantee & Trust Co., 6 Cir., 133 F.2d 990, 995, and Howard v. Chicago, B. & Q. R. Co., 8 Cir., 146 F.2d 316, but, of course, if the findings are based on documentary evidence alone, we are permitted to determine any question of fact. Carter Oil Co. v. McQuigg, 7 Cir., 112 F.2d 275. Fortunately, there is no question here involving conflicting testimony. The facts are not in dispute.

■■ It must be conceded that plaintiff cannot maintain an action under the provisions of § 7 of the Sherman Act, 15 U.S.C.A. § 15 Note, unless it has suffered an injury in its business or property by reason of the violation by the defendants of some of the prohibitions contained in that Act, Jack v. Armour & Co., 8 Cir., 291 F. 741, 745; Northwestern Oil Co. v. Socony-Vacuum Oil Co., 7 Cir., 138 F. 2d 967. It must show that it was injured, Alden-Rochelle, Inc., v. American Soc. of Composers, etc., D.C., 80 F.Supp. 888, 897, and the mere fact that the defendants have been adjudged guilty in the Toledo case is of no avail to plaintiff unless it establishes that it sustained pecuniary damage. Keogh v. Chicago & N.W. Ry. Co., 7 Cir.,

271 F. 444, 447, and Twin Ports Oil Co. v. Pure Oil Co., 8 Cir., 119 F.2d 747. The plaintiff must show personal, pecuniary damages, Maltz v. Sax, 7 Cir., 134 F.2d 2, 5, which must be proved by facts from which their existence is logically and legally inferable, Keogh v. Chicago & N.W. Ry. Co., 260 U.S. 156, 165, 43 S.Ct. 47, 67 L.Ed. 183. Without actual damages to plaintiff, there can be no recovery. Maltz v. Sax, supra; and Beegle v. Thomson, 7 Cir., 138 F.2d 875, 881.

Plaintiff says it has suffered an injury. It has offered no evidence to prove that it has sustained any pecuniary damage by reason of anything the defendants may have done. We have already observed that Judge Baltzell found that the evidence failed to establish that any of the defendants caused plaintiff's failure or caused any damage to plaintiff's business or property. He found as a fact that before plaintiff became a Hartford licensee, its operating results had been unsatisfactory, and that it was not until plaintiff received Hartford service on its Howard machines that satisfactory results ensued. However, in its briefs plaintiff contends that the payment of the license fees and the entry of the judgment in the Toledo case was evidence of pecuniary damage, and upon oral argument its counsel stated that if the license agreements are legal, plaintiff "is out." We take this to mean that, in the event we hold that the agreements are not inherently illegal, the judgment must be affirmed. Accordingly we address ourselves only to that contention.

 To be sure, for the purposes of this case, the conspiracy to violate the anti-trust laws found at Toledo is established, and, of course, an agreement essentially a part of a scheme to fix the price or curtail the quantity of an unpatented ware would be in violation of the anti-trust laws, Continental Wall Paper Co. v. Louis Voight and Sons, 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486; American Equipment Co. v. Tuthill Bldg. Material Co., 7 Cir., 69 F.2d 406, 409; and United States v. Line Material Co., 333 U.S. 287, 68 S.Ct. 550. But a patentee may grant a license upon any condition if its performance is reasonably within the reward which the patentee is entitled to secure. United States v. General Electric Co., 272 U.S. 476, 489, 47 S. Ct. 192, 71 L.Ed. 362.

Our study of the Toledo case has not convinced us that the inherent illegality of the agreements in our case was considered or decided in that case. We find no language in either opinion of the Supreme Court relating to inherent invalidity of the agreements. It is true, however, that Judge Kloeb said: " * * * a license and lease system may be perfectly legal and just if properly used. However, in the instant case, there has been a deliberate abuse and misuse of that system". 46 F. Supp. 621. In using the quoted language we think the illegality found was that of the licensing system as a whole, in view of the manner in which the court found that it had been used. It in no manner was dependent on illegality of the agreements here involved.

We believe we find the solution of our problem in what was said in Gasoline Products Co. v. Champlin Refining Co., D.C., 46 F.2d 511, and cases cited therein.

The plaintiff in the Gasoline Products case sued defendant to recover royalties under a license agreement. Defendant, as in our case, contended that the agreement was illegal because plaintiff was engaged with others in a conspiracy to violate the anti-trust laws by means of a patent pool for the purpose of establishing a monopoly, fixing prices, controlling the market and extorting huge profits from defendant and others engaged in the manufacture of cracked gasoline, and that the license agreement was issued in furtherance of the illegal combination. The court in rejecting the defense, 46 F.2d at page 514 said: "As the contract is admittedly valid on its face, involving the doing of no wrongful act, by its terms an ordinary and legitimate business transaction, between parties authorized to contract, it is apparent that the defendant, who voluntarily entered into it, must go somewhere back of and outside of the contract to show its illegal nature. This it does or attempts to do by pointing out that the combination was formed for the purpose of stifling competition and fixing prices in its cracking business; and that the contract sued on partakes of the

illegal purpose of the plaintiff, is an essential part of its wrongful scheme, and is a method of carrying it out and reaping the profits made possible by the monopoly.

"The defendant was not a party to the cross-license agreements and I can see no force in the argument that the mere purchase of a sublicense from the alleged illegal combination makes the purchaser a party to it.

"The contract in suit is complete in itself, involves the doing of nothing illegal, and is enforceable without reference to any other agreement. I fail to see how there can be any illegality 'inherent' in one contract when it is necessary to go wholly outside of it and into another contract to find illegality."

■ We find additional support for the proposition that the courts recognize the distinction between inherent and collateral illegality arising out of anti-trust law violations. Bruce's Juices v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219, was an action to recover on notes given for the purchase price of cans. The defendant pleaded that the consideration for the notes was illegal and the notes void because plaintiff had violated the Robinson-Patman Act, 15 U.S.C.A. §§ 13, 13a, 13b. In holding that recovery on the notes could not be defeated by the defense asserted, the court, 330 U.S. at page 755, 67 S.Ct. at page 1020, said: "This Court has held that where a suit is based upon an agreement to which both defendant and plaintiff are parties, and which has as its object and effect accomplishment of illegal ends which would be consummated by the judgment sought, the Court will entertain the defense that the contract in suit is illegal under the express provision of that statute [Sherman Anti-Trust Act]. * * * But when the contract sued upon is not intrinsically illegal, the Court has refused to allow property to be obtained under a contract of sale without enforcing the duty to pay for it because of violations of the Sherman Act not inhering in the particular contract in suit * * *."

■ In our case, Hartford was the owner of the patents. Their validity was not challenged in the Toledo case, nor is their validity attacked here, hence Hartford had the right to lease the machinery covered by the patents. Having that right, and plaintiff desiring to use the machinery, it voluntarily entered into agreements which conferred upon it the right to use the leased machinery in the United States, for the manufacturing of glassware defined as "Permitted Ware." Limiting the use of leased machinery is within the prerogative of a patentee. Compare General Talking Pictures Corporation v. Western Electric Co., 305 U.S. 124, 59 S.Ct. 116, 83 L.Ed. 81. The agreements were complete in themselves, and by the agreements plaintiff secured Hartford's property and received all the benefits of the use of the machines for which it paid the agreed license fees and royalties. The agreement did not fix prices so as to come within the rule enunciated in United States v. Line Material Co., supra, or limit the quantity of ware that plaintiff could produce, or the markets in which plaintiff's glassware could be sold. See American Equipment Co. v. Tuthill Bldg. Material Co., supra. They did not involve the doing of anything illegal, and each of the agreements was enforceable without reference to any cross-license agreement or agreements into which the defendants might have entered among themselves.

Under these circumstances we are impelled to the conclusion that the licensing agreements were not inherently illegal. Accordingly the judgment of the District Court is affirmed.