196 F.2d 779
 In re CHAPMAN COAL CO.
NATIONAL ACCEPTANCE CO. OF CHICAGO
v.
MAGILL.
NATIONAL ACCEPTANCE CO. OF CHICAGO
v.
DISTRICT NO. 1, PROGRESSIVE MINE WORKERS OF AMERICA, et al.
 Nos. 10358, 10359.
 United States Court of Appeals Seventh Circuit.
 May 13, 1952.
Rehearing Denied June 11, 1952.
 
 Archie Schimberg, Robert Liberman, Chicago Ill., for appellant.
 Robert M. Magill, G. W. Horsley, L. H. Lenz, Springfield, Ill., for District No. 1, Progressive Mine Workers of America.
 Before MAJOR, Chief Judge, and LINDLEY and SWAIM, Circuit Judges.
 SWAIM, Circuit Judge.
 
 
 1
 These appeals, prosecuted by the National Acceptance Company of Chicago, hereinafter referred to as 'National,' question the validity of two orders which the District Court entered on January 9, 1951, in a reorganization proceeding instituted under Chapter X of the Bankruptcy Act. 11 U.S.C.A. 501 et seq. On November 29, 1950, Chapman Coal Company, the debtor, hereinafter sometimes referred to as the 'Company,' filed its petition for reorganization in accordance with the provisions of Chapter X of the Bankruptcy Act. By an order entered on the same day the petition was approved and the debtor was continued in possession.
 
 
 2
 On November 29, 1950, District No. 1, Progressive Mine Workers of America, and Local Union No. 41 of the same organization, hereinafter referred to as the 'Union,' also filed a petition alleging that all of the mine worker employees of the Company belonged to and were represented by Local Union No. 41, and that under the terms of the contract between the Union and the Company, the Company was indebted to its individual employees for labor performed prior to that date in the sum of approximately $4,200.00, which constituted a preferred claim against the Company. The petition further alleged that the Company owed the Union the sum of $200.00 for union dues withheld by the Company from the pay of the employees and that the Company was in default in the amount of $900.00, since November 23, 1950, on its contractual obligation to pay to the Co-Trustees of the Welfare and Retirement Fund 30 cents on each ton of coal mined for use or resale. The petition stated that this fund was held by the Co-Trustees for the payment to the miners of weekly benefits on account of illness and injury, to pay medical and hospital expenses on said miners and their dependents, and to pay pensions and retirement benefits to the miners and death benefits and pensions to the dependents of deceased miners. The petition alleged that under the terms of the Trust Agreement between the Company and the Union no payments could be made from the Welfare Fund while the Company was in default in its payments to the fund. The petition also alleged that it would be to the best interests of all parties that the operation of the mine be continued during the period of the reorganization and that the continued employment of the miners was necessary to such continued operation.
 
 
 3
 In its petition the Union offered to continue the work of the miners on the following conditions: (1) that the miners' past-due wages and the amount due to the Welfare and Retirement Fund be paid by the Company within sixty days, (2) that their current wages be paid out of the receipts of the sale of coal at the mine, and (3) that the amount which had been withheld by the Company from the miners' wages be paid to the Union. The petition asked that the court enter an order authorizing the continued operation of the mine and the continued employment of the miners on the above conditions.
 
 
 4
 Thereafter, on December 8, 1950, National filed an answer to the Company's petition for reorganization alleging the note and liens held by it against the debtor Company and stating that National would not consent to any plan of reorganization modifying, altering or extending the terms, provisions or agreements contained in any of the securities then owned by it. This answer also alleged that the petition filed by the debtor was not filed in good faith; that it was unreasonable to expect that a plan of reorganization could be effected; and that adequate relief could be obtained by the debtor under Chapter XI of the Bankruptcy Act, 11 U.S.C.A. 701 et seq. This answer asked the court either to dismiss the petition for reorganization or to transfer the proceedings to Chapter XI of the Bankruptcy Act and then to appoint a receiver.
 
 
 5
 One week later, on December 15, 1950, National filed its petition for leave to foreclose its liens on the Company's property. This petition alleged that the debtor had defaulted on its note dated February 23, 1950, in the original principal sum of $78,000.00; that the payment of the note was secured by various liens on the debtor's properties, real and personal; and that there was an unpaid balance on the note of $64,250.00, together with interest at the rate of 1 1/2 per cent per month upon each installment from the date of default. Attached to this petition as exhibits were copies of the note, the various assignments, the indenture and the mortgage giving National first liens on the debtor's properties. These instruments authorized the foreclosure of the liens and the sale of the properties in the event of a default by the Company on its note.
 
 
 6
 On January 9, 1951, the District Court entered an order on the Union's petition reciting that the creditors had been given proper notice; that a hearing had been held; that the court had heard the evidence of witnesses; and that no objection had been made to the entry of the order on behalf of any of the creditors except National. The court found that the material allegations of the petition were true. The court expressly found:
 
 
 7
 'That it is to the best interests of all parties concerned that coal be produced at the mine of the Chapman Coal Company during the pendency of this matter before the court, so that the assets of the said corporation may be preserved and said business held together as a going concern while efforts are being made to refinance the obligations of said corporation, or to reorganize the same under the orders of this court, * * * that while such mine is in the possession of the debtor by order of this court, and being operated by such debtor under such orders since November 28, 1950, the wages due the said employees under said labor contract and the payments due to the Welfare and Retirement Fund as provided in said contract should be made a part of the cost of administration of this proceeding and should be a first and prior lien upon the assets of said corporation, including the mortgage lien of the National Acceptance Company of Chicago.'
 
 
 8
 Pursuant to these findings, the court ordered:
 
 
 9
 '1. That while said mine is operated under the orders of this court the officers of said corporation shall pay to the employees thereof all wages for labor so expended in such operation in accordance with the terms of said labor contract, and in addition thereto, shall pay to the Co-Trustees of the Welfare and Retirement Fund of the Progressive Mine Workers of America, District 1, a sum of money equivalent to thirty cents (30cents) per ton on each ton of coal mined for use or resale, all of such wages and Welfare payments to be paid from November 28, 1950, and to continue so long as said mine is operated by virtue of the orders of this Court.
 
 
 10
 '2. That such wages and Welfare payments shall be and they are hereby made a part of the administration expenses of this matter and shall be a first and prior lien upon the assets of said corporation, including the mortgage of the National Acceptance Company of Chicago.'
 
 
 11
 The court then, on the same day, entered an order on the petition of National. This order recited that there had been a hearing on National's petition during which the court had 'heard the evidence in respect thereof and statements of counsel.' The court found the facts as to the execution and delivery of the note and the various instruments securing it. The court found that there had been default on the payments by the Company, that the entire balance on the note was due and payable and that, by reason of the default, National was 'entitled to immediate possession of the goods and chattels described in said chattel mortgage and to sell the collateral deposited and pledged under said note,' and that National was entitled to foreclose the indenture. The order adjudged and decreed that National had 'a first, prior and subsisting lien' upon all the personal property described in the chattel mortgage and upon the collateral deposited under the note and upon the real estate described in the indenture 'subject only to the expense of administration and operation for the preservation of the assets subject to said lien, as may be provided by order of Court.' The order authorized and directed the company to pay to National the sum of $2,170.00 on or before the second day of each month commencing February 2, 1951, and continuing until the further order of the court. The hearing on this petition was then adjourned until February 5, 1951.
 
 
 12
 Notices of appeals from these two orders were filed by National. In its statement of points to be relied upon on its appeal from the order on its petition, Appeal Case No. 10358, National named only two alleged errors:
 
 
 13
 '1. The Court erred in decreeing that the lien of National Acceptance Company of Chicago is subject to costs of administration, expenses of operation of the business and preservation of the assets of the bankrupt.
 
 
 14
 '2. The Court should have decreed that National Acceptance Company of Chicago has a first and prior lien upon the assets described in its securities as set forth in its Petition to Foreclose.'
 
 
 15
 In its appeal from the order entered upon the Union's petition, Appeal Case No. 10359, National alleged as errors: (1) the finding that the wages and Welfare Fund payments due under the labor contract between the Company and the Union 'while the mine * * * is in possession of and operated by said company should be made a part of the cost of administration,' and should be a first and prior lien on the assets of the Company prior to the lien of National; (2) the finding that it was 'to the best interests that the mine of the Chapman Coal Company be operated in order to preserve its assets'; and (3) the decree that the wages and Welfare Fund payments were to be a part of the administration expenses and were to be a first and prior lien upon the assets of the Company and prior to the mortgage lien of National.
 
 
 16
 On January 24, 1951, National filed its designation of the portions of the record and proceedings which it deemed necessary to present the alleged errors in the two orders. This designation included National's petition for leave to enforce its lien and the order thereon, the Union's petition and the order thereon, the involuntary petition in bankruptcy filed January 15, 1951, and the order of adjudication thereon entered on the same day, and the appointment and qualification of the receiver. A supplemental designation filed a week later included the Company's petition for reorganization, the order thereon and National's answer to the petition.
 
 
 17
 National in its appellant's brief herein, filed November 27, 1951, presented two propositions of law on which it relied:
 
 
 18
 'I. Administrative expenses of an abortive reorganization proceeding may not be charged against the fund of the non-assenting lienholder.
 
 
 19
 'II. The expenses and costs of operating the business of a debtor or bankrupt are not properly chargeable against the non-assenting lienholder.'
 
 
 20
 After National filed its brief the Union filed its motion for leave to file an additional transcript of record, alleging that the hearing on the petitions of the Union and of National, on which the two questioned orders were entered, was actually held on January 3, 1951; that said hearing was reported by the official court reporter; and that the appellees did not promptly designate additional record covering this hearing because the Union did not, and could not, anticipate that National would contend that it (National) did not have notice of the hearing and that it did not assent to the operation of the mine pursuant to the Union's petition. This motion further alleged that the transcript of the hearing would show that National had due notice of the hearing; that National's attorney was present at and participated in the hearing for National; and that National's attorney acquiesced in the action of the court in ordering the continued operation of the mine and the continued employment of the Company's mine workers.
 
 
 21
 This court, on January 14, 1952, granted the Union leave to file an additional transcript of record and thereafter, on January 28, 1952, this court entered an order approving a stipulation by the parties 'that the time in which appellees may file additional transcript of record * * * be extended up to and including March 15, 1952, * * * .' Pursuant to this stipulation, the order of this court, approving the same, extended the time accordingly. Within the time as so extended the Union filed an additional transcript of record which purported to show the proceedings, as reported by the court reporter, including various statements made by National's attorney and by the court, and certain evidence heard in the hearing held in the District Court on the petitions of National and of the Union. This transcript, filed by the Union, was not certified and transmitted to this court by the Clerk of the District Court as is required by Rule 75(g) of the Federal Rules of Civil Procedure, 28 U.S.C.A., and by Rule 10 of the Rules of this court.
 
 
 22
 National thereafter, on March 25, 1952, filed a motion in this court, (1) to vacate the order of the court entered January 14, 1952, permitting the Union to file and additional transcript of record; (2) to strike the additional transcript of record; and (3) to strike parts of the additional transcript of record. The reason assigned by National for vacating the order of January 14th was that the order was entered without giving National time to file opposing affidavits or briefs. This part of National's motion overlooks the fact that a later order to the same effect was entered by this court on January 28, 1952, on a stipulation of the parties which was signed by National's attorney.
 
 
 23
 National insists that the Union's additional transcript of record should be stricken because this court, on December 14, 1951, had refused permission to file it. However, the order of December 14th was nullified by the later orders entered by this court on January 14 and January 28, 1952.
 
 
 24
 National also moved to strike the additional transcript of record for the reason that the transcript filed was not certified by the Clerk of the District Court. As we have pointed out above, it is true that the additional transcript filed in the office of the Clerk of this court was not so certified. For that reason the additional transcript never became, and is not now, a part of the record on these appeals. Rule 75(g) Federal Rules of Civil Procedure.
 
 
 25
 National further insists that the additional transcript of record filed by the Union is inaccurate, incomplete and misleading and supports this contention by the affidavit of Kenneth H. Lemmer, in which Lemmer said that he, as an attorney representing National, appeared at the hearings on January 3, 1951. Lemmer's affidavit alleges that in many particulars, the additional transcript does not present a true record of the proceedings below. The affidavits and counter-affidavits filed by the parties herein in their attempts to show what did or did not happen at the hearing illustrate the necessity for requiring that the record which is to be considered on appeal must be certified and transmitted by the Clerk of the District Court as provided in Rule 75(g) of the F.R.C.P. For these reasons we have not considered anything in this additional transcript in deciding this case.
 
 
 26
 The two propositions of law on which National relies in these appeals assume the existence of two facts: first, that the reorganization proceeding approved by the court on November 29, 1950, was an 'abortive' reorganization proceeding; and, second, that throughout the proceedings in the District Court it, National, las a 'non-assenting' holder of liens on the properties of the company.
 
 
 27
 As to the first of these contentions, the District Court, in its order made pursuant to 11 U.S.C.A. § 541, expressly found that the petition filed by the debtor for reorganization complied with Chapter X of the Bankruptcy Act, and that the petition had been filed by the debtor in good faith. The record before us furnishes no basis for saying that the finding of the District Court on this question was erroneous. The reorganization proceeding, therefore, could not accurately be termed 'abortive.' The mere fact that the court and the interested parties concluded forty-five days later that the debtor should be adjudicated a bankrupt and that a receiver should be appointed, does not compel the conclusion that the plan for reorganization was not in compliance with Chapter X and was not filed in good faith.
 
 
 28
 Nor is the record before us so clear that we can say as a matter of law that National was such a non-assenting lienholder that other facts brought out at the hearing on January 3, 1951, may not have justified the District Court in entering these orders subordinating the liens of National to the necessary expense of operating the mine for the purpose of preserving the assets. The various liens held by National apparently covered all of the company's assets, real and personal. It is true that in the answer filed December 8, 1950, by National to the debtor's reorganization petition, National said it would 'not consent to any plan of reorganization modifying, altering or extending the terms, provisions or agreements' in any of the securities owned by it. It is also true that in the order entered on the Union's petition the District Court stated that no objections had been made to the entry of that order 'on behalf of any said creditors, except the National Acceptance Company of Chicago.' The order does not reveal the specific grounds of National's objections to the order nor the particular part of the order to which National objected.
 
 
 29
 As we have pointed out above, in its answer to the petition for reorganization National objected to the debtor's being continued in possession and continuing to operate the mine, and alleged, among other reasons therefore, that the debtor's petition had not been filed in good faith, that the debtor could obtain adequate relief under Chapter XI of the Bankruptcy Act, and that it was unreasonable to expect that the suggested plan of reorganization could be effected. In that answer National also alleged that if the debtor continued in the operation of its business and continued to use the mine equipment National would suffer irreparable damage.
 
 
 30
 Since National, as the appellant, failed to bring up a transcript of the proceedings which occurred on January 3, 1951, we must assume that in that hearing there were statements by counsel or agreements between the parties or evidence which convinced the District Court that continued operation of the mine and continued employment of the mine workers were necessary for the preservation of the mine properties of the debtor, and that such operation would be 'to the best interests of the parties,' including National which held a lien on all of the properties of the debtor. National, in its appellant's brief, admits that it was necessary to protect the mine against flooding and that it was also necessary to protect the mine property from loss by theft and casualty. The record before us clearly indicates that it was possible to continue the operation of the mine only by continuing to employ the mine workers. It is also clear that the employment of the mine workers was possible only on the condition that their wages and Welfare Fund payments were to be currently paid. Such payments could only be made from receipts from the operation of the mine because the debtor had insufficient cash on hand to make such payments.
 
 
 31
 In its brief National insists that it 'consistently opposed the continued operation of the debtor in possession' and took immediate steps seeking leave of court to foreclose its mortgages. The record before us shows only that National, on December 15, 1950, filed its petition for leave to foreclose its liens and the order on that petition entered January 9, 1951, in which the District Court found that the Company's debt to National was due and that National's liens were valid first liens, 'subject only to expense of administration and operation for the preservation of assets subject to said lien, as may be provided by order of Court.' The order on this petition authorized and directed the Company to make the monthly payments to National which the note called for, commencing February 2, 1951, and then adjourned the hearing on National's petition until February 5, 1951. The record shows no further steps by National concerning its petition nor for the enforcement of its lien. This petition by National and the order thereon do not necessarily show that National, in the hearing held on January 3, 1951, did not agree to forego immediate foreclosure and did not agree that the Company should be left in possession to operate the mine. We should think it probable that in the absence of such an agreement by National, the District Court would not have entered this order.
 
 
 32
 If National did agree that the Company should be left in possession and should be permitted to continue operation of the mine, an operation which the District Court found was 'to the best interest of all parties concerned * * * so that the assets of' the debtor might be preserved, National should not later be permitted to avoid all responsibility for such operation by the simple expedient of objecting to the entry of an order which would guarantee to the mine workers their regular pay for the work which was necessary to the operation of the mine.
 
 
 33
 The record here does show that National held a lien on all of the Company's property, real and personal. The record does not show whether there was actually any equity in the property over the balance which the Company owed to National. If there was no such equity, the continued operation was in effect for the preservation of National's property and, therefore, only for National's benefit.
 
 
 34
 Where, as in this case, there has been a hearing in the District Court in which the parties have participated by their attorneys, where evidence has been heard, and where the District Court has entered an order which would be justified by evidence which might have been adduced or agreements which might have been made between the parties in such hearing, the burden is upon the party appealing from such an order to include in the record on appeal a proper transcript of the hearing to show that there was no such evidence or agreement. All possible presumptions are indulged to sustain the action of the trial court. It is, therefore, elementary that an appellant seeking reversal of an order entered by the trial court must furnish to the appellate court a sufficient record to positively show the alleged error. Turner Glass Corp. v. Hartford Empire Co., 7 Cir., 173 F.2d 49, 51; Royal Petroleum Corp. v. Smith, 2 Cir., 127 F.2d 841, 843; 12 Cyclopedia of Federal Procedure, 2d Ed. 1944, Sec. 6208, p. 224 et seq.
 
 
 35
 That was not done by the appellant here. It follows that each of the orders appealed from must be and is
 
 
 36
 Affirmed.